ROSCHER, D. B. A. PARAMOUNT SALES CO., APPELLANT, *v.* BAND BOX CLEANERS, INC., ET AL., APPELLEES.

(No. 7463—Decided July 2, 1951.)

*Mr. Stewart S. Cooper,* for appellant.

*Messrs. Hoover, Beall, Whitman & Eichel,* for appellees.

*Per Curiam.* In this appeal from a judgment of the Municipal Court of Cincinnati, the plaintiff-appellant seeks to obtain the reversal of the judgment in favor of the defendants in two cases which, by order of the court, were consolidated and tried together.

The actions involved the sale of a patented article to the two defendants, who, it is alleged, paid for a part of the quantity furnished and refused to pay for the balance. The statement of defense contained, first, a general denial and, second, the following statement:

"Further answering defendant says that it was induced to purchase the merchandise set forth in the bill of particulars of the plaintiff herein by the false representations of the agent of the plaintiff herein, and further that said representations were made with the knowledge of their falsity and with intent to deceive this defendant and that said defendant had a right to

rely on such representations which consisted of statements made by the agent of the plaintiff herein. That the devices sold by plaintiff to defendant could be utilized without violating the rules and regulations of the Cincinnati & Suburban Bell Telephone Company.''

The reply was in effect a general denial.

It is claimed by the defendants that the allegations in the statement of defense justified a claim that there was a breach of express warranty. Section 8392, General Code, is claimed to be applicable. In this section it is stated:

''Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, *nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty.*'' (Emphasis added.)

This section must be read in connection with Section 8395, General Code, in which it is stated:

''In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.''

An examination of the evidence discloses that previous to the consummation of the sale to the defendants there was a conversation between a salesman for plaintiff and officers of the defendants which were closely associated in the operation of the same type of business enterprise.

The president of Conlee Dry Cleaners, Inc., stated:

''Q. You stated that Mr. Beecher was asked by you if he thought the use of the ad caps would be permissible with the telephone company, and his answer was

that, in his opinion, you would have no trouble with the telephone company, is that correct? A. Something to that effect. I didn't take it down. I don't know exactly what words he used."

The president of the Band Box Cleaners stated:

"Q. Tell the court what conversations took place between you and Mr. Beecher at that time. A. He came in and showed me this medium of advertising; and it happened that Mr. Conlee had shown it to me while we were in Chicago some weeks previous to that. So I mentioned that fact to Mr. Beecher there, and he told me just what—the number that he required us to buy in order to get the exclusive arrangement for it in our trading area that we served; and he told me about Mr. Conlee had already ordered them. So I, at that time, did mention to Mr. Beecher about a difficulty with the telephone company. He said, well, he didn't think there would be any trouble with it and he had gone into that with Mr. Conlee; and he showed me an order from Conlee for these ad caps. So I just ordered them, too, in order * * *."

From the evidence it further appears that the patented article, the subject of the controversy between the parties, consisted of a small plastic circular cap which could be placed over a circular projection usually appearing in the center of the dialing mechanism found on the so-called "French" telephone instruments. Printed upon such plastic attachment were appropriate telephone numbers of (1) the fire department, (2) the police department, and (3) the ambulance department—each applicable to the area in which each defendant operated its business.

Also on each plastic attachment was the telephone number of the appropriate defendant in such areas.

There is no claim that these plastic attachments would not fit the proper projections on the telephones

or that the telephone numbers printed on such attachments were incorrect.

As indicated from the previous quotations from the record, it appears that all parties were aware that the telephone company might have some objections to the use of these attachments. It appears from the record also that not only was this true, but that the telephone company had a definite published tariff rule upon the subject, the terms of which appear to have been brought into evidence in a question by counsel for one of the defendants.

Reference to the following portion of the record indicates the provisions of regulation 9 of the tariff schedules of the city of Cincinnati and the Suburban Bell Telephone Company:

"No equipment, appartus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the telephone company shall have the right to remove and disconnect the same; or to suspend the service during the continuance of said attachment or connection; or to terminate the service. Now you were aware that that tariff regulation appeared in the telephone book? A. No, sir, that is the first time I ever heard.

"Q. You didn't know that this regulation appeared in the telephone book? A. No, sir.

"Q. You say you have been selling these ad caps for a year and a half? A. That is right.

"Q. You have never had any contact with a regulation similar to the one that I have read? A. That is correct."

It appears that none of the parties were familiar

with the *specific terms* of this regulation, although in a general way they were cognizant of its existence. It appears that such regulation is published in each telephone directory furnished subscribers, and, hence, the specific terms thereof were available to all concerned.

It seems that the controversy which ripened into the litigation here considered originated when a representative of the telephone company called on one of the defendants and objected to the use of the plastic caps which were being gratuitously distributed by the defendants for use by their customers upon their telephone instruments.

From the following quotation from the record it appears that the representative of the telephone company stated its position, as follows:

"Q. What did you tell Mr. Allen, Mr. Daughters? A. In calling on customers who are distributing the ad cap or any other foreign device, we ask to interview the owner or the manager or someone in a management position. I did the same thing calling at the Conleo company. This gentleman said he would take care of me. I then stated my business, that it had come to our attention that these ad caps were being distributed; we merely wanted to let them know that it was in violation of our tariff for a customer to *associate* them with the instrument; that our employees would remove any that were found attached, and that in some cases it is possible for the customer to whom they have delivered that cap to have his telephone service disconnected, which could have repercussions on the distributor."

It is clear from what has been said herein and from the quotations from the record that the whole claim of the defendants justifying a cancellation of the sales contract is predicated upon the original conversation with the sales representative of the plaintiff.

What did this conversation, the substance of which is admitted by all parties, constitute in effect in the light of the claims of the defendants? Simply an expression of opinion that it was the *belief* of the plaintiff's salesman that the telephone company would not enforce its published rule which was available to all parties. The plaintiff's salesman did not guarantee freedom from such enforcement. Certainly, the defendants could have easily obtained the information *before* sale which they acquired from the representative of the telephone company after use of the caps.

Therefore, it must be concluded that the trial court was in error in rendering judgment for the defendants if such judgment was based upon either misrepresentation or breach of warranty, and especially is this true in view of the fact that the subject of sale was a patented article.

Something also has been said about the failure to make a redelivery of that portion of the merchandise for which payment was not made. It appears that there is some evidence that the defendants refused to accept C. O. D. that portion of the merchandise. However, it appears also that plaintiff ordered redelivery, abandoning the C. O. D. requirements, and the evidence indicates that redelivery was made. Certainly, there is no evidence to the contrary.

So viewing the matter, it is the conclusion of this court that the judgment of the trial court must be reversed and the cause remanded for further proceedings according to law.

*Judgment reversed.*

HILDEBRANT, P. J., MATTHEWS and ROSS, JJ., concur.