A. L. BROWN, Appellee,

v.

GENERAL MOTORS CORPORATION, Appellant.

No. 9925.

United States Court of Appeals Fourth Circuit.

Argued June 2, 1965.

Decided Jan. 13, 1966.

J. Spencer Bell, Circuit Judge, dissented.

James B. McMillan, Charlotte, N. C., and Bynum M. Hunter, Greensboro, N. C., for appellant.

Lewis P. Hamlin, Jr., Salisbury, N. C. (Clarence Kluttz, Salisbury, N. C., on brief), for appellee.

Before BRYAN and BELL, Circuit Judges, and BARKSDALE, District Judge.

ALBERT V. BRYAN, Circuit Judge:

Damages for personal injuries resulting from breach of warranty in the manufacture and sale of a crawler tractor, familiarly known as a bulldozer, were adjudged in the District Court against General Motors Corporation. The plaintiff, Alexander L. Brown, had declared against G.M. in two counts, one in warranty and the other in negligence. In answer to specific interrogatories, the jury found no negligence and no contributory negligence but did find a breach of warranty. Because of misconduct of certain jurors and a conflict in an answer to another interrogatory, the Court set aside the verdict in respect to primary and contributory negligence but entered a final judgment on the warranty finding. G.M. appeals.

In our view the evidence was insufficient in law to establish liability either on warranty or in negligence. We reverse, and order entry of judgment for the defendant on its motion for a directed verdict at the conclusion of the evidence.

Brown, a mechanic, was employed by a subsidiary of Blythe Brothers Company, the lessee-purchaser of the machine. The machine was designated as a Euclid C–6 Crawler Tractor, weighing about 40,000 pounds, propelled by a diesel engine with automatic transmission and moving on belt treads. At the time of his injury Brown was employed to service this and other heavy pieces being used by Blythe Brothers Company on a road-building job at Anderson, South Carolina. The machine had been operating normally for the approximately three months preceding the accident.

About eight o'clock on the evening of November 10, 1960 Brown and a fellow employee, Gulley, were preparing the tractor for use the next morning. To grease the universal joints, Brown seated himself on the left track, facing the engine, his legs extending down between the track and the body. While the task could be performed in a safer manner, that is by removing certain floorboarding, it was frequently done at the point Brown had selected.

Gulley was in the driver's seat where he could reach the starter button, but as it was then dark, he could not see whether the tractor was in gear. At Brown's request, Gulley "bumped", that is touched momentarily, the starter button to rotate the drive shaft so as merely to turn the grease fitting toward Brown. Instead, the engine was started and the machine, then in gear, moved backwards, crushing Brown between the tread and the heavy fender projecting over it.

Manufactured in Hudson, Ohio, the machine had been sold and delivered by G.M. in Ohio on August 18, 1960 to the manufacturer's dealer, from whom it was lease-purchased by the plaintiff's employer, Blythe Brothers.

The centerpiece of the plaintiff's claim is the starter mechanism on this tractor, which was new and different from that of other and earlier earth-moving Euclids. The other units carried an instrument called a micro switch, which broke the starting circuit except when the range selector control lever (the gearshift lever) was in neutral. The purpose of the micro switch was to prevent unintentional starting of the machine while in gear. This was the type of starter system on the C–6 Crawler Tractors

made by General Motors until July 1960 when it abandoned the micro switch for a new design which it considered more "rugged."

On the C-6 tractor which injured Brown, instead of a micro switch, the range selector control lever was equipped with a semicircular metal flange or shield (mechanical block), installed close to the starter button. Because of the position of the shield, an operator in the driver's seat could see the button only when the lever was in neutral. However, the button was accessible to an operator, though not without difficulty, if he reached his thumb or finger up behind the shield and into the space—measured as ⅛ or ¼ inch—between the shield and the button, as Gulley must have done.

Operator's Handbooks were issued by General Motors both for the pre-1960 and the subsequent C-6. The two publications are similar except that the later one includes a reference to the "mechanical block on the range selector lever". This book was delivered with the present tractor.

Under "Driving Instructions" is a description of each control, including the following:

"1. Transmission Range Selector —Permits the operator to select the proper speed range for the prevailing work conditions. The lever MUST be in neutral in order to start the engine."

Still under "Driving Instructions" are these directions, which are especially apposite because Brown was hurt in the starting of the engine:

### "NORMAL STARTING

\*    \*    \*    \*    \*    \*

"*Shift the transmission into neutral. A micro switch or a mechanical block* on the selector control lever does not permit the starter switch to operate unless the lever is in neutral." (Accent added.)

### "TRANSMISSION OPERATING HINTS

Do not shift range selector into neutral *except when starting engine. Leave in gear at all other times.*"

Under a heading of "SAFETY", a list with illustrative cuts of specific things the operator should "never" do, and what he should "always" do, is this caution:

"Make sure no one is working on unit before *starting* engine or moving tractor." (Accent added.)

The premise of Brown's claim is the change in the starter appliance from micro switch to shield. This modification, he contends, resulted in the following contractual and tortious breaches of responsibility. It violated: (1) express warranties in the handbook because the shield did not prevent the engine from starting while in gear; (2) the warranty of merchantability and fitness implied by law, since the shield was a latent defect and the machine, therefore, not reasonably safe for its purposes; (3) the law of negligence, in that no adequate warning was given of the danger arising from the change from micro switch to shield; and (4) the doctrine of strict tort liability, in that the C-6 contained a defect, and the supplier, G.M., was answerable to the user, Brown, without proof of negligence in the manufacture.[1] This last argument we are not compelled to classify precisely, as correctly relating to warranty or to negligence. Rather, we shall measure the facts of the case against this and the other contentions of the plaintiff as each becomes pertinent.

For our decision we may assume, as Brown avers, that the court of the forum (North Carolina) would apply Ohio law to the warranty phase of the case. See *Price v. Goodman*, 226 N.C. 223, 37 S.E.

---

[1] Restatement of the Law of Torts 2d, § 402A et seq.; Keeton, Products Liability —Liability Without Fault and the Requirement of a Defect, Texas Law Review

852, October 1963; Keeton, Recent Decisions and Developments in the Law of Products Liability, Insurance Counsel Journal 620, October 1965.

2d 592 (1946). We assume, likewise, that under Ohio law the plaintiff, as one expected to use the unit, has standing to assert a breach of warranty against G. M. as the manufacturer, without proof of contract privity. Inglis v. American Motors Corp., 3 Ohio St.2d 132, 209 N.E. 2d 583 (Sup.Ct.1965). We assume, too, that Ohio has embraced the principle of strict tort liability. See Lonzrick v. Republic Steel Corp., 1 Ohio App.2d 374, 205 N.E.2d 92 (1965); Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N.E.2d 612, 75 A.L.R.2d 103 (1958). As to negligence, concededly, the law of South Carolina, the lex loci delicti, controls.

On plaintiff's claim of breach of express warranty, we think, the language posed by the plaintiff does not constitute an express warranty. Taken from the Operator's Handbook, it is pleaded and relied upon as consisting of the following sentences, included in the excerpts just quoted:

> "A micro switch or a mechanical block on the range selector lever does not permit the starter switch to operate unless the lever is in neutral.
>
> \*     \*     \*     \*     \*     \*
>
> "The lever MUST be in neutral in order to start the engine."

Entirely overlooked is the obvious character and function of these statements. An express warranty is generally defined as a factual affirmation or promise, the natural tendency of which is to *induce* the buyer to purchase the goods. See Roscher v. Band Box Cleaners, 90 Ohio App. 71, 103 N.E.2d 404 (1951); Pritchard v. Liggett & Myers Tobacco Co., 350 F.2d 479, 483 (3 Cir. 1965). While actual reliance by the buyer is not a requisite of a warranty, the characteristic of inducement to purchase is an indispensable ingredient of an express warranty. The statements here are not representations to induce the buying of the machine. Merely "advisory", they only instruct the operator on how the machine *should* be operated. Ivey-Dale-Owen Co. v. Worthington Co., 29 F.2d 280 (5 Cir. 1928). Furthermore,

they do not purport to vouch what *could or could not* be done with its mechanisms. The instructional character is manifested also by the associated directions in the manual. They all pertain to "Normal Starting". These explanations and directions are the only clauses on which the plaintiff structures his warranty claim. Plainly, he lifts them out of context.

However, if these statements in the handbook are to be treated as warranties, then all of them must be read, and read together, including for example this illustrated caution following the plaintiff's selections from the book:

> "Make sure no one is working on unit before starting engine.   \*   \* "

Of course, a manufacturer may not avoid liability by general safety precautions, but here the warning specifically cautioned against the very conduct which led to the injury. Presently, to repeat, the manual was also most explicit in teaching the proper manner of starting the machine. As yet, a manufacturer is not obligated to define what can or cannot be done with its products, or to warn as to all possible dangers. See Jamieson v. Woodward & Lothrop, 101 U.S.App.D.C. 32, 247 F.2d 23, 30 (1957), cert. den., 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63. In sum, under all the other facts, it is difficult to comprehend how liability can be predicated on the statements taken by the plaintiff from the instructional manual.

Although there be no express warranty, there is a warranty implied by law on the part of the manufacturer. It is an assurance that the product is free of latent defect, in merchantable condition and fit for the purpose for which it was made. Carney v. Sears, Roebuck & Co., 309 F.2d 300 (4 Cir. 1962). To recover on such a warranty the plaintiff must show that one or more of these pledges has been broken. Only the presence of a latent defect is charged by the plaintiff.

But actually there was no defect. No contention is made that the shield

was badly constructed, contained intrinsic flaws or was of defective design. At best the plaintiff accuses the shield as a latent defect because it failed to give protection equivalent to that of the micro switch. While the law does not imply such a warranty, no want of a comparable protection has been established. This will be evident in the discussion, post, of the same element anent negligence.

Of course, there is a responsibility upon a manufacturer to a user of its machine for negligence. In Restatement of the Law of Torts 2d, § 388,[2] it is put in this way:

"Chattel Known to be Dangerous for Intended Use. One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

The immediate inquiry, then, is whether by using the shield rather than the micro switch G.M. fulfilled its duty not to put on the market without a warning of the hazard, a tractor embodying a latent danger. To start with, our conclusion is that the machine here involved has not been proved a dangerous instrumentality. While it is spoken of in plaintiff's brief as "tradition" or "custom", we are pointed to no proof that a tractor which will start in gear is per se a dangerous instrumentality. Accord: Yaun v. Allis-Chalmers Mfg. Co., 253 Wis. 558, 34 N.W.2d 853 (1948). Hence no special instruction or warning was required.

But even if that obligation was here, the evidence affirmatively shows that it was satisfied or that G.M.'s failure to warn did not in any degree contribute to Brown's injury. That the shield was intended as a protection against the starting of the engine except when the selector lever was in neutral, was patent from the device itself. How the motor was started and the shield performed were obvious. As noted in Campo v. Scofield, 301 N.Y. 468, 95 N. E.2d 802 (1950):

"[T]he manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all."

The shield in itself was a warning. It had no other purpose or function, the regular operator said as a witness for the plaintiff. Of course he knew, he further stated, the machine would start in gear if one reached under the shield and pressed the button. Other witnesses for the plaintiff testified similarly.

As the starter button was completely obscured from the driver when the engine was in gear, a glance told the operator that the button should not be pressed when the shield was over it. As Gulley remarked on the stand, "It's [the shield is] there for a protective cover, so you can't start it. * * * "

It is obvious that both Brown and Gulley were aware that the tractor *could* be started in gear but that it *should not* be. They were well acquainted with the tractor and how it operated. Indeed, Brown had been a student of Diesel heavy equipment as well as a practical operator, and Gulley explicitly testified, "* * * I knew it had the cover on the starter button, to protect the starter".

2. See also Dillard & Hart, Product Liability: Directions for Use and Duty To Warn, 41 Va. Law Rev. 145 (1955).

In supplying the handbook for the use of the purchaser, the plaintiff's employer, G.M. fully responded to its duty to provide instructions or to warn, even assuming the equipment was a dangerous instrumentality. The passages already quoted confirm the scrupulous and painstaking concern of the producer to safeguard the operator. They squarely meet the calls of warranty and negligence. If the handbook was not shown to Brown or Gulley by their employer, who apparently deemed it superfluous as a warning, this was no fault of the defendant.

It should be noted that even the microswitch device did not, according to the testimony, bar the starting of the engine while in gear. The switch could be readily by-passed, simply by putting one thumb on the starter button and the other on the switch, both being immediately in front of the operator.

█ Again, no principle of warranty or negligence required G.M. to provide the very best means of protection. The plaintiff can claim, at the most, only that the shield is not as efficient as the micro switch, but this is not enough to impose liability on the manufacturer. Failure to adopt the most modern, or even a better safeguard, did not render the manufacturer liable to the injured mechanic. Marker v. Universal Oil Prods. Co., 250 F.2d 603 (10 Cir. 1957); Campo v. Scofield, supra, 301 N.Y. 468, 95 N.E.2d 802 (1950); Tyson v. Long Mfg. Co., 249 N.C. 557, 107 S.E.2d 170, 78 A.L.R.2d 588 (1959). Exercising its judgment G.M. deliberately changed from micro switch to shield. There is no indication in the evidence that the shield was not at least a reasonable preventive of injury.

█ Finally and most importantly, both the rules of warranty and negligence apply only when the machine is operated in the manner intended for it. See, e. g., Hardman v. Helene Curtis Industries, Inc., 48 Ill.App.2d 42, 198 N.E.2d 681 (1964); Strahlendorf v. Walgreen Co., 16 Wis.2d 421, 114 N.W.2d 823 (1962). If not so employed, then the machine does not come within the implied warranty. Nor in such circumstances may liability be rested in tort, for the manufacturer cannot be held to foresee an unpredictable misuse. As stated in Marker v. Universal Oil Prods. Co., supra, 250 F.2d 603, 606 (10 Cir. 1957):

"While a designer or manufacturer may have a duty to warn of a latent limitation in even a perfectly made article, * * * no such duty extends to the potential danger involved in the totally unanticipated misuse of an item. [Citations omitted.]

When Gulley "bumped" the engine, as Brown directed, he was groping in the dark. He depended exclusively upon his feel for the instruments in order to turn the shaft. He cannot say whether he felt under the shield or just how he reached the starter. Concededly, if the engine was in gear, he could touch the starter only by squeezing his thumb or finger between the shield and the button, contrary to the design of both.

█ Certainly, the manufacturer did not warrant the safety of the machine against a blind operation of it; nor was it reasonably foreseeable that the machine would be activated by one fumbling in the dark. See Marker v. Universal Oil Prods. Co., supra, 250 F.2d 603, 606 (10 Cir. 1957). While the question of proper use is generally for the jury, there must of course be evidence sufficient to raise the jury question. Surely, the acts of Brown and Gulley, including Brown's directions to Gulley, prove an utter want of compliance with this condition, thereby precluding submission of the issue to the jury.

█ Contributory negligence need not be considered for two reasons. First, primary negligence has not been established. Secondly, where as here, a consumer uses a product in a manner not intended by the manufacturer and suffers an injury as a result, he may not recover because such misuse is beyond the scope of the warranty. Pritchard v. Liggett & Myers Tobacco Co., supra, 350 F.2d 479, 485 (3 Cir. 1965).

This recount and discussion of the facts reveal that the plaintiff is not entitled to recover even under the doctrine of strict tort liability. This doctrine is basically one of public economic policy [3]—that a consumer's loss should be put on the manufacturer of the culpable product, to be included as a cost of production. However, to come under even its broad aegis, there must be a showing of a defect in the accused device. None has been demonstrated by the plaintiff.

For these reasons we think there was no issue of liability to go to the jury and a verdict for the defendant should have been directed. The case will be remanded to the District Court for the entry of judgment for the defendant.

Reversed and remanded.

J. SPENCER BELL, Circuit Judge (dissenting):

I would affirm the judgment because I think the record offers more than enough evidence to support the jury's finding of breach of warranty by the defendant. At the very least I agree with the trial judge that the plaintiff is entitled on this record to have his claim of negligence submitted to a jury.

The majority is guilty of several errors which distort its analysis of the case. First, the conclusion that the statements contained in the manuals were not warranties because they did not tend to induce a sale. It is not necessary that a statement be a definite and crucial reason for the sale but only that it be one of a package of attributes which the buyer is seeking. Certainly a careful purchaser, knowing that his employees will be working on the machinery at night under adverse light conditions, is concerned with the safety devices built into the equipment. In any event I think that this court exceeds its authority in finding as a matter of law that the statements do not constitute a warranty in this type of case where the suit is in tort under the Ohio law of strict tort liability. Under the factual context of this case I think the matter would have been more properly left to the jury.

Second, the majority argues that the manuals adequately warned against "starting" the machine, but this overlooks the very heart of the plaintiff's case. The plaintiff was not attempting to "start" the machine—that was the very thing he did not want to do. He was merely attempting to "bump" the starter in the usual and customary manner in order to turn up the grease cup on the drive shaft. The majority lays much stress on their conclusion that there was no "latent" defect in the machine. But the fallacy of this argument is that it equates latent defect with design defect and ignores the very essence of the plaintiff's case, which is that the latent defect consisted in removing the micro switch, a safety device on which its users were accustomed to depend, and substituting therefor the shield.

It is generally accepted law that when one undertakes to provide for the safety of another when he knows that the other will rely on this undertaking he must take care in termination of that assistance. " * * * the actor is not free to discontinue his services where a reasonable man would not do so. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated." Restatement 2d, Torts § 323 comment c. This holds true whether or not there is any duty to provide for the other's safety. In a similar situation the Ohio court said:

"The rule generally recognized is that, notwithstanding that a railroad is under no duty to maintain a flagman at a particular crossing, if it has customarily provided one to warn of the approach of all trains to that crossing, then, at least so

3. Restatement of the Law of Torts 2d, § 402(c), (g); Keeton, Recent Decisions and Developments in the Law of Prod-ucts Liability, Insurance Counsel Journal 620, 629, October 1965.

far as persons who know of that customary practice are concerned, the failure of a watchman to warn of an approaching train may constitute negligence, even in an instance where the approach of such train would not ordinarily involve an unusual hazard to an approaching automobile." Tanzi v. New York Central R. Co., 155 Ohio St. 149, 98 N.E.2d 39, 24 A.L.R.2d 1151, 1158 (1951).

No warning was given of the hazard left by the replacement of the microswitch by the mechanical block. The general warning statements relied upon by the majority were contained in the previous manuals for the models with microswitches. Certainly their verbatim continuance cannot give warning of a *new* hazard to one already familiar with the machines. At the one place where a new statement was added it stated the function of the mechanical block as identical to that of the micro-switch, in fact, it merely inserted the words "or mechanical block" after the words "microswitch." [1] This gives no adequate indication of a new hazard. A mechanical block, to the average reader, could have served the function of the micro-switch of making the starter circuit inoperative. We think the majority usurped the function of the jury when it concluded that the shield was, to the ordinary observer, an obvious substitute for the microswitch which was removed without warning. A jury could conclude that the shield was apparently there to prevent the operator from accidentally hitting the starter button while the machine was in motion and was therefore an additional "safety" feature to the micro-switch. There is nothing in the record to justify the notion that a user would, upon seeing the shield instantly deduce therefrom that the micro-switch had been withdrawn. Finally, it may be quite true

that a manufacturer is not required to use the most modern or expensive safety devices, but once having accustomed his users to a particular device we submit a jury could find negligence in the withdrawal of that device without adequate warning, and it is immaterial that another more or less efficient device is substituted. Even the defendant did not contend that the shield was a more efficient device but merely that it was "more rugged." Cheaper would be a better description.

The majority concedes the manufacturer's liability to the user of its machine for negligence, citing the Restatement of the Law of Torts 2d § 388. This section makes the manufacturer liable for injury in its normal use if (a) the danger is foreseeable and (b) not apparent to the user and (c) he fails to warn. We pass over the argument that a 20 ton hydromatic tractor crawler which will start in gear is not a chattel known to be dangerous when employed for its intended use. The universality of the micro switch and similar devices to prevent machines from being unintentionally started in gear is adequate evidence of their dangerous propensities. In any event the question was for the jury. There was evidence that the danger was foreseeable by the manufacturer, as the defendant's own witnesses testified they knew of the manner of greasing used by the plaintiff and they warned their own dealers of the change, presumably because they thought it not apparent.

Before turning to the law of Ohio relating to warranties let me point up certain aspects of the facts of this case which will be relevant to the application of that law. While the evidence showed that it was possible to lubricate the universal joints upon which the plaintiff Brown was working by removing four bolts and lifting up the floor boards

---

1. Original wording:
   A micro switch on the range selector control lever does not permit the starter switch to operate unless the lever is in neutral.

   Revised wording:
   A micro switch or a mechanical block on the range selector lever does not permit the starter switch to operate unless the lever is in neutral.

of the machine, all the evidence showed that it was customary and was the practice to perform this service by sitting on the tracks as the plaintiff was doing when injured. Mr. Faggart, an experienced employee of the Euclid distributor which sold the machine, testified that this was the normal practice. He also conceded that although the defendant's maintenance manuals recommended frequent greasing of these joints, they did not suggest any specific position from which they could be reached. The evidence also showed that the machine was functioning normally at the time of the accident and that it was possible to start the machine in gear by pressing on the starter button with the thumb or forefinger when the machine was in first gear. The built-in slippage of the automatic transmission made it possible for the engine to be started in gear; the diesel engine was highly responsive, especially when the engine was hot. The tractor weighed 40,000 pounds and stood half again as high as a man's head.

In Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962), cited by the Ohio court in Lonzrick v. Republic Steel Corporation, 1 Ohio App.2d 374, 205 N.E.2d 92, the plaintiff was injured by a power tool purchased by his wife from the defendant. The action was on express warranties included in a brochure which accompanied the tool and which the plaintiff claimed to have read. The court, ˙ng Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N.E.2d 612, 7. A.L.R.2d 103, pointed out that the abandonment of the requirement of privity, the recognition that the liability is imposed on the manufacturer by law and the refusal to allow the manufacturer to define the scope of its own responsibility for defective products make it clear that the liability is not one governed by the law of contract warranties. The court added:

"In the present case, for example, plaintiff was able to plead and prove an express warranty only because he read and relied on the representations of the Shopsmith's ruggedness contained in the manufacturer's brochure. * * * Under these circumstances, it should not be controlling whether the plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or because he merely assumed that it would safely do the job it was built to do."

I think the Ohio cases and those upon which the Ohio court expressly relied in enunciating its doctrine make it clear that the Ohio law of product liability goes beyond the requirement of proving negligence; it would hold the manufacturer for any injury to one who was using the product in the manner in which it was intended to be used. I think this would apply whether the injury arose out of a defect in the product, per se, or out of the manner of its distribution such as an inadequate warning of a latent danger in its normal use,[2] or improper instructions as to its use. The danger must, of course, be reasonably foreseeable and the injury must be proximately caused by the default of the manufacturer.

Turning now to the case at hand, I think the court correctly charged the jury under the Ohio doctrine of strict tort liability for manufactured products that the defendant was responsible if the plaintiff's injury was proximately caused by a breach of the defendant's express warranty that the machine would not start in gear. This is true even though the plaintiff did not have knowledge of the express warranties contained

2. In Ross v. Phillip Morris & Co. Ltd., 328 F.2d 3 (8 Cir. 1964), cited in Lonzrick, the court held that under Missouri law the manufacturer would be liable in damages where he "did not warn of the probability of lung cancer resulting from smoking defendant's cigarettes." See also: Product Liability: Directions for Use and the Duty to Warn, Dillard and Hart, 41 Va.L.R. 145, and cases therein cited.

in the operator's and maintenance manuals. It was for the jury to determine whether or not the plaintiff's reliance on the absence of any warning was a proximate cause of his injury—and the express warranty was clear proof that such notice was not forthcoming from the manufacturer. Nor was this the only evidence which went to the jury on this issue, for the defendant's service manager and safety expert [3] testified that although he knew of the change in the starter and informed his dealers, he did not inform his customers and users, of which latter class the plaintiff was a member.

The fact that the machine itself may not have constituted a dangerous instrumentality in the absence of the express warranty would not in my opinion relieve the defendant. Users of its products over a long period of time were entitled to an adequate warning of any change which constituted a hidden danger to those who were accustomed to use defendant's products, and defendant was as liable for a danger created by change without warning as for an inherent defect in the machine itself. A manufacturer who works in concert with his authorized dealer (as here where the manufacturer prepares and dealer distributes descriptive literature with the product to potential users) is as much liable for a negligent failure to warn as

for an inherent defect in the machine. Cf. Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964). A fortiori, he is liable for an express misstatement of a characteristic of his product which, as here, lulls his users into danger and injury.

Mr. Morgan, Blythe's chief mechanic, testified that he received and placed on file in his library for study the manuals distributed with this machine when he first saw the machine on the job sometime prior to the accident. Morgan, and indeed the defendant's witness Faggart, testified that it was long standing practice to grease the tractor crawlers just as the plaintiff was doing by sitting on the tracks. It would be wholly incompatible with the concept of strict liability to hold that the plaintiff must have had personal knowledge of the defendant's false warranty which not only would not have warned him, but would in fact have misled him. It is enough that the manufacturer could reasonably foresee that the danger existed when they changed the design of the starter not only without giving their customers and users a proper warning but by expressly misrepresenting the fact. I think this issue was correctly submitted to the jury in the judge's charge that they must find the defendant's breach of warranty to be the direct and proximate cause of the plaintiff's injury.

3. Mr. Knight, who was service representative for the Euclid Division of General Motors for Virginia and North Carolina, testified that in addition to his safety work he kept the dealers informed on improvements in the products and equipment, held service meetings, helped to settle claims, kept the factory informed as to Euclid performance in the field and things of that nature.