George **BANKO** and United States Aviation Underwriters, Inc., Plaintiffs,

v.

**CONTINENTAL MOTORS CORPORATION,** Defendant.

Civ. A. No. 2796.

United States District Court
E. D. Virginia,
at Alexandria.

Feb. 9, 1966.

Philip F. Herrick, M. B. Spaulding, Jr., Washington, D. C., for plaintiffs.

Eppa Hunton, IV, and Harry Frazier, III, Richmond, Va., for defendant.

OREN R. LEWIS, District Judge.

The plaintiffs, George Banko and United States Aviation Underwriters, Inc., brought this suit against Continental Motors Corporation and Downer Aircraft Company to recover damages sustained in an airplane accident. The claim was predicated upon negligence and breach of warranty—express and implied.

Downer Aircraft Company, whose manufacturing plant is in Alexandria, Minnesota, was dismissed as a party defendant upon the failure of the plaintiffs to establish that Downer was doing business within the Commonwealth of Virginia.

The case was heard without the aid of a jury—this phase of the hearing being limited to a determination of liability.

The evidence discloses that the plaintiff, George Banko, was a citizen of Ohio and that the plaintiff, United States Aviation Underwriters, was incorporated under the laws of New York and has its principal place of business in that state. The defendant Continental Motors Corporation was incorporated under the laws of Virginia and has its principal place of business in Michigan.

On or about August 11, 1959 the plaintiff, Banko, purchased the aircraft in question, a Bellanca "260" from the

Downer Aircraft Company through one of its authorized dealers. This aircraft was powered by a model 10470–F Continental engine manufactured by the defendant Continental Motors Corporation.

Downer designed the air induction system [1] for the Bellanca "260" and installed the Continental engine and induction system in the aircraft sold to Banko.

Continental was familiar with the air induction system as installed, having flown similar airplanes, but took no part in the design or installation and did not advise Downer regarding the air intake sources.

The 10470–F engine was designed and constructed to permit the airplane manufacturer (in this case Downer) to use any means of ice prevention necessary to meet civil air regulations.

The Federal Aviation Agency granted the type certificate for the 10470–F Continental engine December 3, 1958. No carburetor air heat rise or formal icing tests were required by the Federal Aviation Agency for this type engine (fuel injection).

Continental Motors advertised extensively in the past—carburetor heat is never required with a continuous flow fuel injection engine. A sample advertisement reads:

"The engine icing hazard inseparable from carburetor type aircraft engines vanishes when you fly with Continental Fuel Injection, for the refrigerating effect of vaporizing fuel at the carburetor is ended by eliminating the carburetor itself. With Continental Fuel Injection, no carburetor heat is ever required. You always use the coldest available air, for maximum power."

A Continental circular (printed 9–58), in announcing its continuous flow system, states that freedom from icing is one of its advantages. The back page of the circular reads:

"Several other advantages are yours with fuel injection, too. You get better acceleration, with no tendency to stall after idling, because fuel is always present at each cylinder. Even without heated induction air, there is no danger of icing, because the refrigerating effect of vaporizing at the carburetor is removed. Power output is improved at every engine speed."

Continental's Fuel Injection System Manual (10–1–60) reads, among other statements, "There is no danger of icing * * * even without heated induction air."

Continental's engine warranty, printed on page one of its Operations Manual and Service Maintenance Instructions book, states in substance that Continental Motors Corporation warrants each new engine or part to be free from defects in material and workmanship, when properly installed and used under normal conditions, for one hundred fifty days or in no case to exceed one hundred hours of operation after the shipment of each engine or part from the plant. The warranty further states it is expressly in lieu of all other warranties or representations, expressed or implied, and all other liabilities on the part of the Aircraft Engine Division of Continental Motors Corporation.

Banko was an experienced private pilot, licensed some fifteen years to fly under visual or instrument flight rules, single and multi land aircraft and single engine sea aircraft. He had flown some five thousand hours. He had seen and was familiar with Continental's advertising and circulars describing its continuous flow fuel injection engines prior to the consideration of the purchase of the aircraft in question.

1. The air induction system consists of three major components. First, the air intake, which is located at the front end of the airplane. Second, ducking which runs down along each side of the engine, which carries the air from its entrance at the air scoop back to what is commonly called the mixing box. From this the air goes into what the defendant Continental calls an air throttle body.

The unusual feature of this aircraft to Banko was—"there was no need for any carburetor heat or any auxiliary heat along the carburetor or air path through the engine."

Banko had flown the aircraft in question from the date of its purchase (August 1959) to the date of the accident (January 19, 1961) without incident. On that date his flight began in Cleveland, Ohio, under visual flight rules—weather relatively clear—to Finley, Ohio. From Finley to Baltimore weather reports were not the best. As he approached Bellaire, Ohio, the weather reports were such that Banko requested and received an instrument flight plan—seven thousand feet MSL via Victor Airways 474, 92 and 44. In climbing to seven thousand feet he passed through clouds and haze and some rain. He proceeded on this flight plan without incident until he was forced to crash land near the Grantsville VOR Station due to engine failure.

In his report of the accident Banko stated that at seven thousand feet the following conditions prevailed:

"Temperature 12–15° Fahrenheit, sky above blue with sun visible, horizon visible two miles, tops of lower deck about four thousand feet MSL, no ice crystals visible.

"Shortly after passing Grantsville VOR Station, the engine power dropped to idle and he could not move the throttle from the full forward position. He turned to an east landing, towards Cumberland, Maryland, descending. He broke out of the overcast in a snow condition with a ceiling of twelve to fifteen hundred feet."

The aircraft crashed on a farm near Frostburg, Maryland. The wreckage was resting in a level position in a cornfield, covered with about twenty inches of drifting snow.

Upon examination of the wrecked aircraft the following was evident: Aircraft heading one hundred degrees on the magnetic compass. Landing gear in a retracted position. Both propeller blades bent aft about thirty-five degrees at the tips. Both engine bed stringers buckled. The wing skin was parted cordwise at the inboard end of the aileron. The wing tip was buckled with a gouge at the tip covered with dirt. Examination of the cornstalks above the snow indicated the initial landing swathe was about two hundred forty degrees. The left gas tank was half full, the right tank one-third full. The throttle was forward, in the full open position, and could not be moved by hand. Mixture control forward could not be moved. Bottom of crankcase concaved and landing gear nose wheel assembly buckled.

Because of severe cold weather and snow conditions the wreckage was not removed to the Cumberland, Maryland, airport until February 3, 1961 (some two weeks after the date of the accident). The engine air assembly was then removed and a piece of ice was found in the carburetor air chamber at the butterfly throttle valve location.

Federal Aviation Agency inspectors examined the ice and determined it was three-quarters of an inch thick, the same diameter as the inside chamber area. A small hole about five-sixteenths of an inch, the size of a lead pencil, was the only space through which air could enter. A one-half inch deep circular slot in the ice matched the position of the lower side of the throttle valve in the full open position.

After the ice was removed the throttle and mixture controls moved through full travel range when operated by the respective controls. The air intake screen, ducts and alternate air assembly were examined and found free of any foreign matter.

John Nash, the person who disassembled the airplane at F.A.A.'s request, testified that he found ice in the throat of the mixing valve—some three and a half inches back of the throat—the butterfly valve was frozen to this. He found no evidence of snow inside the engine cowling. Nash then put the ice in his deepfreeze so that it might be seen by the Federal Aviation Agency inspectors.

The Federal Aviation Agency, on completion of its investigation of the crash, advised Downer

"On the basis of the data presented in your letters * * *, and the fact that our records do not indicate any other instances of engine induction system icing in your model * * * airplane, we do not feel that any further action is necessary at this time."

An expert called by the plaintiffs, when asked to express an opinion as to what caused the stoppage of the engine on Mr. Banko's aircraft, stated:

"I believe that it was ice formed in the induction system at a point at the lower section of the air throttle body, caused by the expansion of the air in passing through the restricted section between the mixing section and the air throttle body."

This was caused by a mismating of the mixing box and the air throttle body. If the mating had been perfect

"ice would not have formed at that point but would have formed farther up here, where the restriction of the throttle and the throttle shaft occurs. * * * [T]he situation[2] that existed in the Bellanca aircraft was the most susceptible to icing of the systems that we have discussed here. * * * [H]e [Banko] happened into a situation with just right conditions conducive to ice formation and that the ice did occur. This is not to say it wouldn't have occurred in other systems."

The difficulty, according to this expert, was a design failure in the system "in failing to provide either heated surfaces to the induction system as a part of the design or to provide an alternated heated air source which had the capabil-

ity and was under the control of the pilot to be used in the event of icing."

Experts called by the defendant were of the opinion that the ice found in the throttle throat must have been water which froze into ice someplace in the induction system prior to that point, which was dislodged and entered at that point and became wedged there. Their opinions were premised upon the belief that throttle ice would not have formed in the shape in which that ice plug was found—"If you had conditions which would have formed throttling ice, it would have probably have formed on the leading edge of the throttle plate."

The parties agreed that the law of Maryland—the place of injury—governs the negligence aspects of this case. The elements of negligence there (Maryland) are substantially the same as here (Virginia), namely, want of due care—the failure to do what an ordinary prudent manufacturer would do under the same or similar circumstances.

■ Gauged by this yardstick, it is clear that the plaintiffs have failed to establish negligence on the part of Continental Motors. Concededly Continental made no formal icing tests[3] and provided no air heat rise for its fuel injection engine. None was required by the trade, the manufacturer of this airplane (Downer), or the Federal Aviation Agency, each recognizing the generally ice-free characteristics of this type of engine.

The weather conditions through which Banko was flying just prior to the crash were abnormal.[4] The icing here was an isolated case of engine induction system icing in a fuel injection engine, it being the only case known to the industry or the Federal Aviation Agency.

■ There was no duty on the part of Continental to provide a heated throt-

---

2. Air intake system designed and installed by Downer.

3. Continental relied upon service experience obtained by flying its fuel injection engines all over the country in all kinds of weather.

4. Coles, the icing expert called by the plaintiffs, stated "Banko happened into a situation with just right conditions conducive to ice formation."

tle body and butterfly valve under the control of the pilot. The only evidence so indicating is the opinion expressed by the expert called by the plaintiffs. This witness expressed the opinion that the accident—that is, the engine failure—was caused by the lack of a heating apparatus—a design failure.

This opinion standing alone is not enough to establish negligence on the part of Continental, especially so when weighed with the findings that the 10470–F engine was designed and constructed to permit the airplane manufacturer (in this case Downer) to use any means of ice prevention necessary to meet civil air regulations—that the air intake system used on this airplane was designed and installed by Downer—that the Federal Aviation Agency did not then, nor does it now, require a carburetor air heat rise for this type engine—that the Federal Aviation Agency required no corrective action after ice was found in the air induction system following the accident in question.

■ Neither can the plaintiffs recover from Continental via warranty—express or implied.

An express warranty is generally defined as

"[A] factual affirmation or promise, the natural tendency of which is to induce the buyer to purchase the goods. * * * While actual reliance by the buyer is not a requisite of a warranty, the characteristic of inducement to purchase is an indispensable ingredient of an express warranty." See Brown v. General Motors Corporation, 355 F.2d 814, decided by the United States Court of Appeals for the Fourth Circuit January 13, 1966, and the cases cited therein.

The express warranties here relied upon are the advertisements and circulars published by Continental. Banko claims he had seen and was familiar with them prior to his consideration of the purchase of the aircraft in question but does not claim they induced him to buy. When read as a whole these publications cannot be construed as constituting an express warranty on the part of Continental that its fuel injection engine would not ice under any and all flying conditions.

There are several types of icing hazards known to the aviation industry. The type Continental sought and claimed to eliminate was icing resulting from the refrigerating effect of evaporating fuel or vaporization icing. No claim was made re the elimination of throttling ice, the type found in the air induction system of Banko's airplane following the crash.

To construe the language used as a warranty that airplanes powered by Continental fuel injection engines would not ice under any condition would make Continental an insurer against any and all types of airplane icing in all kinds of weather. Such was never intended, and neither Banko nor any of his witnesses so read and construed the publications.

"It [implied warranty] is an assurance that the product is free of latent defect, in merchantable condition and fit for the purpose for which it was made." See Brown v. General Motors Corporation, supra.

To recover on such a warranty the plaintiff must show one or more of these pledges have been broken. Only the lack of fitness is here charged—this without supporting evidence.

The engine here complained of was a component part of an airplane assembled by another [5]—the necessary air intake system was designed and installed by the airplane manufacturer (Downer)—it was certified December 3, 1958 by the F.A.A., the government agency charged

5. Upon the findings here made, most authorities shift the responsibility to the assembler. See Restatement of the Law, Torts 2nd, § 402 A q.; Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963);

Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965). Neither Michigan, the state of sale, Maryland, the state of injury, nor Virginia, the state of trial, has ruled on this question.

234

with the responsibility of testing and approving engines for use in airplanes. Many thousands of these engines have flown in all kinds of weather since that date without incident. The Banko engine flew from the date of its purchase (August 1959) to the date of the accident (January 1961) without incident.

That the Banko crash was an isolated case is without question. No other accident similarly caused was known to the industry or F.A.A. After investigation re the cause of the accident no engine correction was ordered or made.

■ By law Continental is only required to manufacture an engine reasonably fit for use in an airplane. It is not necessary that the engine be perfect or accident-proof. See U. S. Rubber Company v. Bauer, 319 F.2d 463, 8th Cir. 1963.

■ The only evidence offered by the plaintiffs in support of their claim that the Continental 10470–F fuel injection engine was unfit for use in an airplane was that the fuel injection engine installed in Banko's plane stopped functioning while flying over the Cumberland Mountains due to throttling ice forming in the air induction system. This is not enough.

The Court makes no findings and expresses no opinion as to the liability, if any, of the airplane manufacturer Downer.

The plaintiffs' motion to reopen this case for the purpose of adducing additional testimony—namely, that the Federal Aviation Agency is now considering changes in its regulations concerning the minimum requirements for engine induction systems—will be denied. This testimony, if admissible, would not add anything to the determination of this case.

Counsel for the defendant should prepare an appropriate order dismissing this suit as to Continental, with its costs in this behalf expended, submit the same to counsel for the plaintiffs for approval as to form, and it will be accordingly entered.