**Delmar Ray COOK, Plaintiff,**

v.

**BAKER EQUIPMENT ENGINEERING COMPANY, INC., Defendant.**

No. C–165–WS–73.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

March 16, 1977.

William H. McElwee, III, of McElwee, Hall & McElwee, North Wilkesboro, N. C., James H. Kelly, Jr., of Hudson, Petree, Stockton, Stockton & Robinson, Winston-Salem, N. C., for plaintiff.

William Kearns Davis, of Deal, Hutchins & Minor, Winston-Salem, N. C., for defendant.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

The plaintiff, Delmar Ray Cook, a resident of North Carolina, brought this negligence action to recover for injuries he received on June 2, 1970, when the aerial platform from which he was working came in contact with high voltage electrical lines on Battleground Avenue in Greensboro, North Carolina. The defendant, Baker Equipment Engineering Company, Inc., a Virginia corporation and manufacturer of the aerial platform from which the plaintiff was working when he was injured, has moved for summary judgment.

At the time of the accident, Cook was employed by Floyd S. Pike,[1] an electrical contractor, from Mount Airy, North Carolina, and was performing contract work for Duke Power Company. He was first employed by Pike in 1964. During 1965 and 1966, Cook performed electrical contracting work for L. W. Roof. He possessed con-

---

1. Reply to Defendant's Tenth Defense and Motion in the Cause filed August 6, 1973, paragraph VI states "[i]t is admitted that the plaintiff has been paid and will be paid certain benefits under the North Carolina Workmen's Compensation Act . . . ."

siderable experience working from aerial platforms. In 1966 he began performing tasks from a thirty-six (36) foot aerial platform. He had worked from the forty-two (42) foot aerial platform around which this controversy centers for one to two years prior to the accident.

At the time this dreadful accident occurred, Cook was in the process of installing a new power line and removing an older 24,000 volt line to allow higher current on a particular circuit belonging to Duke Power Company. This process involved pulling the slack from the existing hot line, repositioning the existing hot line and conductor on the cross arm to make room for the new line, and then running the new line. It is uncontested that the particular pole where Cook was working was a maze of uninsulated high voltage wires. The pole supported at least two sets of double cross arms. A cross arm is a support structure perpendicular to the pole from which wires are suspended as they carry current parallel to the ground. A double cross arm is two cross arms at the same height, one on each side of the pole. Each cross arm composing a double cross arm provides support for the same set of wires. The double cross arms were situated near the top of the 50-foot pole and at thirty (30) to forty (40) inch intervals down the pole. Each cross arm supported three high voltage circuits. Runners (vertical circuit connectors) connected each circuit on the top set of cross arms to circuits on the next lower set of cross arms. As is standard, the high voltage lines, as well as the vertical connecting runners, were not insulated.

The aerial platform or forty-two (42) foot bucket from which Cook was working was manufactured by the defendant, Baker Equipment Engineering Company, Inc., in 1966.[2] The lift device is composed of two booms.[3] The lower boom is attached to the truck. An elbow joint attaches the lower and the upper boom. The bucket or working platform is secured along one side of the upper end of the upper boom. A workman in the bucket can place himself at the proper height and position to perform his specific task by use of hydraulic controls found mounted on the inside of the bucket.

While the lower boom is entirely metal, the upper boom is made of fiberglass reinforced plastic (FRP) which serves to insulate the bucket from the ground. However, the upper boom is not entirely FRP. Both ends of the upper boom have small metal support structures encased. The lower end of the upper boom attaches to the lower boom by use of a metal elbow joint. The upper end of the upper boom contains a metal axial or mounting shaft to which the bucket is secured. The upper boom is actually manufactured by wrapping the FRP around the two metal structures and thereby forming a hollow FRP column. The metal support structure inside the FRP wrapping extends for approximately twenty-four (24) inches from the top of the upper boom to provide necessary strength to support the mounting shaft and bucket.

A metal bracket is bolted to the bucket. The metal bracket provides a receptacle which mates with the metal axial or mounting shaft that extends through the top of the upper boom. The mounting shaft rotates to allow the bucket to remain upright regardless of the position of the boom. The mounting shaft extending from the upper boom, as well as the bucket bracket, is clearly visible and obviously metal. The end of the metal axial or mounting shaft on the opposite side of the upper boom from the bucket and the metal fittings securing the end of the shaft are clearly visible.[4]

2. By order entered September 4, 1974, this Court denied the defendant's Rule 56 motion for summary judgment based upon the statute of limitations.

3. Defendant's Exhibit 3, Operation Manual, Section 1, Number 2, attached as Appendix A, provides a picture of the basic lift device.

4. Defendant's Exhibit 3, Operation Manual, Section 3, Articulating Boom 5515, attached as Appendix B provides a detailed diagram of the components and composition of the lift assembly.

Thus, when one views the upper boom from the upper end, one clearly observes that the bucket is attached along side of the boom by use of a metal bracket and mounting shaft and that the metal mounting shaft is secured on the opposite side of the boom from the bucket by use of metal fittings. While the metal mounting shaft and the encased metal support structure are not visible through the FRP, the bucket bracket on one side of the boom and the fittings on the other side of the boom make it clearly obvious that the metal axial extends through the end of the boom.

On the opposite side of the upper boom from the bucket and a short distance down the upper boom from the mounting shaft fittings, a fiberglass classification plate protects an opening in the FRP column. By removing the classification plate one has access to the gears, chains, and insulating rods which synchronize the position of the bucket with the booms. The fiberglass classification plate is secured to the boom by metal screws thereby guarding the mechanical workings from the elements as well as removing them from view.

At the time of the accident, Cook was working with the center circuit on the top set of double cross arms. He had positioned the bucket below the wire on which he was working but above the wires which were supported by the next lower set of cross arms. He had also positioned the bucket so that the boom was between him and the vertical pole which held the cross arms. Cook insulated all three circuits on the upper cross arm by use of rubber hose type insulating devices. Insulating hoses and rubber blanket type devices were provided by Cook's employer to protect the workmen from uninsulated high voltage lines. Cook admits, however, that he did not insulate the electrical lines supported by the set of double cross arms below the cross arms where he was working and that he did not insulate the vertical runners connecting the circuits from the top set of cross arms with the circuits on the lower cross arms.

It is unknown exactly how the short circuit occurred, but it is uncontested that the electrical shortage which caused Cook's injuries resulted from a phase to phase shortage rather than a phase to ground shortage. That is, the short circuit was not effected by electrical current passing from the aerial platform down the boom through the truck and into the ground, but rather by the electrical current moving from one phase of an electrical circuit to another phase of an electrical circuit by making contact simultaneously with something which acted as an electrical conductor. It seems highly probable that as Cook was removing the slack from the center circuit by pulling the high voltage line that the boom and bucket swayed and made momentary contact with two of the uninsulated high voltage runners which connected the circuits supported by the top set of cross arms with the circuits on the next lower set of cross arms. In any event, the uncontested facts are that two high voltage lines came in contact with two of the possible three metal objects near the upper end of the upper boom: (1) the metal bracket and screws which secured the bucket to the upper end of the upper boom; (2) the metal levers of the hydraulic controls which are utilized to maneuver the bucket; and (3) the small metal screws which secured the fiberglass specification plate to the upper boom just below the mounting shaft fitting.

Because the bucket was not solid fiberglass reinforced plastic (FRP) but was made by encasing a metal shell in FRP, and because the hydraulic controls were secured to the bucket by use of metal screws, and the mounting bracket was secured to the bucket by metal screws, the circuit could have been shorted by touching two phases simultaneously to the hydraulic controls and to the bucket bracket. The current would have flowed through the bracket, through the screws securing the bracket, through the metal innershell of the bucket, through the screws securing the hydraulic controls to the bucket and to the hydraulic controls

levers thus completing the circuit. Similarly, if one of the high voltage wires came in contact with a metal screw which, while securing the classification plate, also touched the encased metal support structure at the upper end of the upper boom, the current could have passed through the metal screw, through the encased metal support structure, through the mounting shaft and to the metal bracket.

Despite the warning provided by the Baker Equipment Engineering Company, Inc., that the boom, while providing a high degree of phase to ground protection, *would not provide phase to phase protection*,[5] the plaintiff contends that, Baker was negligent in the design and manufacture of the aerial perform. Taking the facts in the light most favorable to the plaintiff, as required whenever a motion for summary judgment is made, the Court concludes that summary judgment in favor of the defendant is appropriate.

### *Summary Judgment*

■ The Court is well aware that summary judgment is not a device to dispose of factual dispute. However, if a motion for summary judgment reveals that there is no genuine issue as to any material fact, then summary judgment is appropriate even in cases that, at first glance, appear to involve complex factual and legal issues. *See First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The United States Court of Appeals for the Fourth Circuit has described the function of summary judgment as follows:

[T]he function of a motion for summary judgment is to smoke out if there is any case, i. e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

*Bland v. Norfolk & Southern Ry.*, 406 F.2d 863, 866 (4th Cir. 1969).

The briefs, interrogatories, and depositions filed by the parties in connection with the summary judgment motion have served this function.

■ The Court is concerned solely with whether Baker Equipment Engineering Company, Inc., was negligent in the design and manufacture of the aerial platform which Cook was utilizing when he was injured. Under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court looks to the law of North Carolina to determine the duty incumbent upon the manufacturer, Baker Equipment Engineering Company, Inc., in the design and manufacture of the aerial platform.

The North Carolina Supreme Court in *Tyson v. Long Manufacturing Co.*, 249 N.C. 557, 107 S.E.2d 170 (1959), provided a good discussion of the duty incumbent upon a manufacturer in like situations. In *Tyson*, the plaintiff was employed as a looper on a tobacco harvester. Tobacco pickers had the responsibility of removing the tobacco leaves from the plant and securing the leaves on a chain which acted as a conveyor in transporting the leaves from the front of the harvester to the rear of the harvester where the loopers worked. As a looper, the plaintiff had the responsibility of removing the leaves from the chain, wrapping the

---

5. Defendant's Exhibit 3, Operation Manual, Section 1, Number 9, states:
   *"Hot" In-Air Operations* :
   When working on or near energized conductors (either known or suspected), special conditions arise.
   While the fiberglass boom provides a high degree of electrical insulation between the basket and the truck, there are several things it will *NOT* do.

1. Provide phase to phase protection.
2. Provide phase to ground protection on static lines or guy wires near the basket level.
3. Protect the vehicle from being energized if the lower (steel) boom contacts a low level power source.
Each of these dangers must be recognized and guarded against.

stalks of the leaves with string, and placing the bundle on a tobacco stick. It was uncontested that the plaintiff worked facing the conveying chain and sprocket. When the machine lurched, the plaintiff was thrown, and the thumb on her left hand was caught in one of the many holes in the perforated sprocket.

Seeking damages for her injuries the plaintiff alleged that the tobacco harvester "was negligently constructed in that it had a sprocket with holes large enough for a person's thumb to be inserted therein and inadequately guarded . . . ." In affirming the trial judge's judgment of involuntary nonsuit, the North Carolina Supreme Court specifically rejected any recovery based on strict liability. Rather the Court adopted the rule from *Campo v. Scofield*, 301 N.Y. 468, 95 N.E.2d 802, 803 (1950), which held that a "manufacturer of a machine or any other article, dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers." 107 S.E.2d at 172. The North Carolina Supreme Court then noted:

> In cases dealing with a manufacturer's liability for injuries to remote users, the courts have always stressed the duty of guarding against *hidden* defects and of giving notice of concealed dangers. (Citation omitted).
> 107 S.E.2d at 173.

Because the chain and sprocket, as well as the holes in the sprocket, were clearly visible, the Court concluded that neither a latent defect nor a concealed danger was present. *See also Douglas v. W. C. Mallison and Sons*, 265 N.C. 362, 144 S.E.2d 138 (1965).

The Fourth Circuit in *Brown v. General Motors Corp.*, 355 F.2d 814 (4th Cir. 1966), addressed the issue of a manufacturer's responsibility to a user of its machine for negligence. The plaintiff, a mechanic, was in the process of applying grease to universal joints on the drive shaft of a bulldozer manufactured by the defendant. He had positioned himself on the left tract of the bulldozer facing the engine. His legs were extended down between the track and the body of the bulldozer. At plaintiff's request a co-worker touched the starter in an attempt to rotate the drive shaft so that the grease fittings would be more easily accessible to him. The engine, however, was in gear, and the plaintiff was crushed between the tread and a heavy fender protecting the tread as the bulldozer moved backward. Despite a warning in the handbook which accompanied the bulldozer stating, "[m]ake sure no one is working on unit before *starting* engine . . . ," 355 F.2d at 817, the plaintiff sought to recover for the injuries he sustained.

Although South Carolina substantive law applied to the negligence issue, the Court specifically referred to *Restatement of the Law of Torts 2d* § 388 to determine that no negligence was present. *Restatement of the Law of Torts 2d* § 388 states:

> Chattel Known to be Dangerous for Intended Use
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

This restatement section seems clearly similar to the law in North Carolina.

It is true that a manufacturer, who produces and sells a new article, which, in the exercise of reasonable care, he should know is likely to cause injury in its ordinary use because of some latent defect or because it is inherently dangerous for such use, is liable to the buyer who, without any negligence of his own, so uses it and is injured by such defect or dangerous nature. *Wyatt v. North Carolina Equipment Co.*, supra, [253 N.C. 355, 117 S.E.2d 21]; *Gwyn v. Lucky City Motors, Inc.*, 252 N.C. 123, 113 S.E.2d 302, *Lemon v. Buchan Lumber Co.*, 251 N.C. 675, 111 S.E.2d 868, *Tyson v. Manufacturing Co.*, 249 N.C. 557, 107 S.E.2d 170, 78 A.L.R.2d 588. However, in the absence of a warranty, the manufacturer-seller of even a new article is not liable for injury to the buyer-user by reason of a condition which is plainly observable.

*Douglas v. W. C. Mallison and Son*, 265 N.C. 362, 370, 144 S.E.2d 138, 145 (1965).

Since it is uncontested that the majority of the metal hardware near the upper end of the upper boom was plainly visible and should have provided adequate warning to an electrical workman who had experience working with high voltage electrical circuits, and further in light of the defendant's specific warning concerning the lack of phase to phase protection, it seems obvious that the defendant is entitled to summary judgment.

The fact that the plaintiff might not have been injured if the defendant had used fiberglass screws rather than the metal screws to attach the classification plate to the boom does not alter this result. Both the North Carolina Supreme Court in *Tyson v. Long Manufacturing Co.*, supra, and the Fourth Circuit in *Brown v. General Motors Corp.*, 355 F.2d at 819, cited with approval *Campo v. Scofield*, 301 N.Y. 468, 95 N.E.2d 802 (1950), which stated:

> "[T]he manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all."

Plaintiff contends that because the metal screws, which secured the classification plate to the upper boom, do not appear to be made of a conductive material, a latent defect is present thereby entitling him to survive the defendant's motion for summary judgment. In light of the obvious metal hardware near the end of the upper boom and specific warning concerning the lack of phase to phase protection, the Court is unpersuaded that the plaintiff is entitled to have a jury rule on this issue. This is certainly not a latent defect as was present in *Swaney v. Peden Steel Co.*, 259 N.C. 531, 131 S.E.2d 601 (1963), where a steel truss was not constructed so as to withstand the usual and ordinary method of erection.

Although the Court agrees with the plaintiff that at times a defendant should not be allowed to escape liability by a general disclaimer, the Fourth Circuit resolved this matter in *Brown v. General Motors Corp.*, 355 F.2d at 818, in the manner apposite to this case:

> Of course, a manufacturer may not avoid liability by general safety precautions, but here the warning specifically cautioned against the very conduct which led to the injury.

It is, therefore, ORDERED that the defendant's motion for summary judgment be, and the same hereby is, allowed. A judgment will be entered accordingly.

Appendix to follow.

## Appendix A

The drawing below illustrates the Baker MHDF–42 Articulating Aerial Tower. This unit is designed for standard installation on conventional truck chassis, (directly behind cab). This drawing will familiarize you with the basic unit and breakdown of the main assemblies.

1. Basket
2. Controls
3. Upper Boom (Fiberglass)
4. Elbow Cylinder
5. Main Boom
6. Elevating Cylinder
7. Mainframe—supports Rotation Assembly
8. Outriggers
9. Turret

Appendix B