# Richmond

## JACOBS V. WARTHEN.

### November 20, 1913.

1. APPEAL AND ERROR—*Bills of Exception—Rulings on Evidence—What to Be Inserted.*—A bill of exception to the ruling of the court on the admissibility of evidence is not sufficient, although it gives the question asked the witness and his answer thereto, unless it also contains sufficient of the evidence which has preceded to give this court a clear apprehension of the propriety or impropriety of the ruling of the trial court.

2. EVIDENCE—*Order of Introduction—Discretion of Trial Court.*—Much latitude of discretion should be allowed the trial court in the matter of the examination of witnesses, and its ruling will not be reversed merely because evidence proper in chief was introduced in rebuttal.

3. SALES—*Proof of Sale—Burden.*—In an action to recover the purchase price of personal property sold, the burden is on the plaintiff to prove the sale, but if the defendant denies the sale he has the burden of showing that the property came into his possession in some way other than by bargain and sale.

4. SALES—*Offer and Acceptance—When Title Passes.*—If an offer to sell personal property at a stated price is accepted, and nothing remains to be done to complete the contract, title passes as soon as the offer is accepted.

5. SALES—*Representations of Soundness—As of What Time Applied.*—Representations of the soundness of personal property sold are to be applied as of the time the sale is consummated and the title passes, and not of any subsequent time.

6. SALES—*Caveat Emptor—Fraud.*—In all sales of personal property the doctrine of *caveat emptor* applies, except when there has been a warranty or deception or some fraud, or a deception upon the part of the seller, misleading the buyer to his injury, and upon which the buyer relied.

7. FALSE REPRESENTATIONS—*Burden of Proof.*—A defendant who relies upon false representations of the plaintiff as a defense to an action to recover the purchase price of property has the burden of showing, by a preponderance of affirmative evidence, that the representations were made by the plaintiff, were false, and that the defendant relied upon them and was injured by reason of their falsity.

8. WARRANTIES—*Breach—Burden of Proof.*—The burden is on the defendant who relies upon a breach of warranty of soundness of personal property, to prove the warranty and its breach by a preponderance of affirmative evidence.

9. SALES—*Breach of Warranty—Rescission—Damages.*—Where there has been a breach of warranty of personal property sold, the purchaser may either rescind the contract, if, within a reasonable time, he notifies the seller of his intention so to do and offers to restore the property, in which event the contract is terminated and the parties are restored to their former rights, or he may retain the property and claim as damages against the seller the difference between the value of the property as warranted and its actual value at the time of the sale.

10. WARRANTIES—*What Constitutes a Warranty.*—To constitute a warranty no particular form of expression is required. An apparent intention to warrant is sufficient. It is enough if the words used import an engagement on the part of the seller that the article is what he represents it to be. Any distinct affirmation of quality made by the seller, at the time of the sale, or during the negotiations that led up to the sale, not as an expression of opinion or belief, but as an assurance to the purchaser of the truth of the fact affirmed and an inducement to him to make the purchase, is, if accordingly received and relied on and acted upon by the purchaser, an express warranty.

11. INSTRUCTIONS—*Correct Verdict.*—It is unnecessary to consider the rulings of the trial court on instructions where no other verdict than that rendered could have been properly found upon correct instructions.

Error to a judgment of the Circuit Court of Clarke county in a proceeding by motion for a judgment for money. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The following instructions were given by the court on motion of the plaintiff:

I. The court instructs the jury that while the burden of proof is upon the plaintiff, Warthen, to show that he sold the three horses to Jacobs, yet the burden of proof is upon Jacobs to establish that the horses came into his possession in some way other than by bargain and sale.

II. The court instructs the jury that if they believe from the evidence that Warthen offered to sell to Jacobs the Pendennis mare, the Black Cock horses, and the Semper Ego horse at the price of $1,050, and that said offer was accepted by Jacobs, and nothing remained to be done by Warthen to complete the contract, then title passed from Warthen to Jacobs as soon as the said offer was accepted.

III. The court further instructs the jury if they believe from the evidence that there was a sale of the three horses by Warthen to Jacobs, then in considering whether the said hoses or any of them were unsound, the jury are confined to the condition in which the said horses were at the time the said sale was consummated and title passed, the court telling the jury that it is immaterial whether the horses or any one of them were injured or in a crippled condition after title passed to Jacobs, provided they were uninjured and sound when title did pass.

IV. The court instructs the jury that in all sales of personal property, the doctrine of *caveat emptor,* or let the buyer beware, applies, except when there has been a warranty or deception or some fraud, or a deception upon the part of the seller, misleading the buyer to his injury, and upon which the buyer relied.

V. The court instructs the jury that although they may believe from the evidence that the defendant purchased the horses at an agreed price to be paid for when sold, yet as a matter of law the time of payment in such a case would be a reasonable time after the delivery of said horses to the defendant. The court also instructs the jury that if the defendant relies upon the representation of the plaintiff which he alleges to be untrue, the burden of the proof is upon the defendant to establish that the plaintiff made the representations, that the same were false, and that the defendant relied upon them, and was injured by reason of their falsity, the court telling the jury that to bear this

burden the defendant must do so by preponderance of affirmative testimony.

VI. The court instructs the jury that although they may believe from the evidence that the Semper Ego horse is now crippled and was crippled when he arrived at Jacob's place, yet if they believe that the said horse was sold to Jacobs, then Warthen cannot be held responsible for any injury which may have occurred after said sale was consummated and title passed, the court telling the jury that this is true even though they should believe from the evidence that Warthen warranted his soundness.

VII. The court instructs the jury that if they believe from the evidence that there was a sale by Warthen to Jacobs, and that at the time of the sale the Semper Ego horse was apparently sound, it matters not what the condition of the horse was on the road or when he arrived at Jacob's place, unless they believe from the evidence that Warthen expressly warranted his soundness or knew that he was unsound, or had any knowledge of his being unsound, the court telling the jury that the burden of the proof is upon Jacobs to establish such a warranty or knowledge on the part of Warthen by a preponderance of affirmative testimony.

VIII. The court instructs the jury that if a seller warrants the property sold, and there is a breach of the warranty, the purchaser has the election between two remedies. First, he may rescind the contract, if within a reasonable time he notifies the seller of his intention so to do, and offers to restore the property. In such case the contract is terminated, and the rights of the parties revert as if no contract had ever existed between them. The property belongs to the seller and the purchaser is not liable for the purchase price, and may recover any reasonable expenses to which he may have been exposed. But in order to entitle the purchaser to this remedy, he must, after the

discovery of the breach, act with reasonable promptness in notifying the seller and making offer to restore the property. If he unreasonably delays or does any act in recognition of the contract after knowledge of the breach, he is concluded by the election he has made and must take the property. Nor is he permitted to rescind the contract in part, enforcing it so far as it is favorable to him and reject it so far as it is unfavorable to him. He must rescind as a whole or accept as a whole. He has also but one election. Having elected to stand on the contract he cannot afterwards reject it. Secondly, he may accept the goods and abide by the contract, and rely upon his damages for the breach of the warranty, in which case the property is the property of the purchaser, but he is entitled to set off against the purchase price such damages as he may be entitled to by reason of the breach of the warranty. The measure of damages in such a case is the difference between the value of the property as warranted, and the value of the property as it actually was at the time of the sale.

IX. If the jury believe from the evidence that there was no sale, but that the property was delivered to the defendant to be sold at an agreed price upon a warranty that the property was sound, and the property was unsalable because the property was not as warranted, then it was the duty of the defendant to notify the plaintiff of the breach of the warranty and offer to return the property to him, and he can recover no damages until his offer to return has been made to the plaintiff. His damages in such case would be any expense to which he may have been exposed for the keep of the property after he has offered to return the same, less any profit he may have made out of the contract. The jury are instructed that the defendant should be entitled to set off the $25.00 due by the plaintiff to him if they believe that plaintiff owes him that sum.

At the request of the defendant the court gave the following instruction:

1. The court instructs the jury that to constitute a warranty no particular form of expression is required, an apparent intention to warrant is sufficient. It is enough if the words used import an engagement on the part of the vendor that the article is what he represents it to be. Any distinct affirmation of quality made by the vendor, at the time of the sale, or during the negotiations that led up to the sale, not as an expression of opinion or belief but as an assurance to the purchaser of the truth to the fact affirmed and an inducement to him to make the purchase, is, if accordingly received and relied on and acted upon by the purchaser, an express warranty.

*Marshall McCormick* and *F. B. Whiting,* for the plaintiff in error.

*Downing & Weaver,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action is brought by A. L. Warthen, upon notice under the statute, to recover of the defendant, E. B. Jacobs, the sum of one thousand and fifty dollars ($1,050.00) the purchase price of three horses, named Semper Ego, Black Cock and Pendennis, which were delivered to the defendant at the plaintiff's stables on April 1, 1911. The defendant at the calling of the case for trial filed the plea of the general issue in assumpsit and two special pleas, under oath, setting forth his defense: (1) That he had never bought the horses; and (2) that he took them to sell for the plaintiff, and had incurred expenses in the care and keep of them in the sum of $564.00, for which amount he was entitled to a judgment against the plaintiff, and al-

leging that the plaintiff had warranted the horses to be sound and high class.

The theory of the plaintiff is, (1) That he sold to the defendant the three horses at the agreed price of $1,050, without a warranty; and (2) that although he did not warrant the horses to be sound, yet as a matter of fact they were sound when delivered to the defendant.

Upon the issue joined and the evidence introduced by the respective parties, the jury rendered a verdict in favor of the plaintiff, assessing his damages at one thousand and twenty-five dollars, for which amount and interest thereon from the date of the verdict the court entered its judgment, to which this writ of error was awarded.

It appears from the evidence that on March 30, 1911, the defendant, who resides in Clarke county, Va., and who was engaged in the buying and selling of horses, came to Front Royal, Warren county, and looked over the stables of the plaintiff. After doing so he informed the plaintiff that he had a customer in New York who would probably be pleased with the horse, Pendennis; and that he might also handle the Black Cock horse; but that he would be especially pleased to purchase Semper Ego, since he liked this animal better than any of the other horses which the plaintiff owned. Plaintiff informed defendant that Semper Ego was not for sale; that he had purchased him for his own use, but that he would be glad to dispose of any of the other horses which he then had in his stables. During the afternoon of the day of defendant's visit to plaintiff's stable, he asked permission to ride Semper Ego to the horse show grounds, a distance of about one mile from Front Royal, which was granted, and at the same time he took with him the horse Black Cock. The defendant, accompanied by a son of the plaintiff, and one William Smith, went to the show grounds, and attempted to jump Semper Ego. The horse, being green, never having been trained or

schooled, refused to jump, but this did not seem to lessen defendant's admiration for the animal, he making the remark in the presence of young Warthen and Smith that he "had a boy who could break him if there was any break in him." Defendant rode Semper Ego back to plaintiff's stables, and left on the evening train for his home. The plaintiff was not then at home, and hence he had no further conversation with plaintiff since his refusal to sell or price the horse, Semper Ego. Upon defendant's arrival at his home, he called plaintiff over the 'phone, telling him that Semper Ego had "behaved very badly," but that nevertheless he liked him, and again insisted upon plaintiff selling him. Plaintiff, however, again refused to entertain any proposition of sale, again giving as his reason, that the horse was of a type that he liked and that he had determined to keep him for his own riding. On the following morning defendant wrote plaintiff as follows:

"March 31st, 1911.

"Dear Mr. Warthen:

"The girl to buy your Pendennis mare arrives Tuesday night, the 4th, and if the mare goes anything like right she will buy her. I wrote the man who was to come Sunday to put it off until he heard from me. I think he would buy your Black Cock or Mitchell horse. Also have a party who wants a hack for himself and one for his wife. I would like very much indeed to have your Semper Ego, and will run up to see you almost any time you have time to have an hour of heart to heart talk.

"Don't fail me on the Pendennis mare, as I will be in a real hole if I don't get her.

"Sincerely,
"EDWARD.

"Will send for Pendennis mare Monday."

About the middle of the day that this letter was written defendant again called plaintiff over the 'phone to inquire if he had received the letter. Plaintiff replied that he had received it, and that rather than send the Pendennis mare alone, he would sell defendant the three horses, Black Cock, Pendennis and Semper Ego, for $1,100. Defendant replied that he didn't have the money at that time, and plaintiff then said that he didn't care for the money at that time, and if he (defendant) would take the three horses at $1,100 he could pay for them "as he got it out of the horses;" whereupon, defendant offered $1,000 for the three horses, and they finally "split the difference," fixing the price at $1,050, defendant agreeing to send his men for them on the following morning, April 1, 1911. On April 1 defendant sent two negroes for the horses, who arrived at plaintiff's stables after he had left for Baltimore, and the horses were turned over to them by William Smith in the presence of five other disinterested persons, one of them a veterinarian, all of whom have testified in this case that the horses were sound and uninjured when they departed for defendant's home.

Plaintiff heard nothing whatever from the defendant or the horses until the lapse of three weeks, when, on April 21, defendant wrote him as follows:

"Dear Mr. Warthen:

"I have been trying to get you over the 'phone for the past three days, but my 'phone has been out of order. I want you to come here to see the Semper Ego horse. My boy was all day getting him here, as he staggered and had to be led down some of the hills. He is better than he was, but when I brought him out yesterday to show to Twigg, I had to have a man on each side of the door to keep him from hitting his hips. Neither Twigg nor the Captain noticed it, so I had him put back as quick as I could, and

told them he was too green yet for what Twigg wanted. I have phoned Humphrey and Cameron to come here today.

"Sincerely,

"EDWARD B. JACOBS."

It is readily to be observed that defendant admits that he was able to 'phone for veterinaries, but why, at the same time, he was unable to 'phone the plaintiff he does not explain; nor does he explain why his efforts to 'phone plaintiff were confined to the "past three days," when the horses had been in his possession for the past three weeks; hence, it was but natural for the plaintiff to believe, as he claims he did, that defendant or his employees, while attempting to school and jump the horse, Semper Ego, injured him, and having every reason to conclude that if, as defendant stated, the horse was injured when he arrived at defendant's home, he would not have waited three weeks before making complaint and paid no attention to the letter. The impressions of plaintiff, as was to be expected, were strengthened when on May 4 defendant sent him a certificate from the veterinary to the effect that the horse was "suffering from a severe strain over the loins which gives him a tottering gait."

Having heard nothing from defendant, plaintiff, on May 18, wrote him as follows:

"Dear Edward:

"I hope the Semper Ego has gotten O. K. I did not go into the matter with you, as I knew the horse was absolutely sound when he left my stable, and that I would have no trouble establishing that fact. Indeed, I think he was hurt after reaching 'Rosslyn,' but as I had no doubt that he would soon come around, I thought it useless to go into that. My understanding of the deal was that you were to pay me $1,050 for the three horses as they were sold.

Of course, I did not understand that I was to assume any risk as to their being crippled or killed. Had they all three died next day I should have expected the $1,050. I have always thought you fair, and still think so, and am only writing that you may know my understanding. I would not have sold them to any one else on such terms, as I had to pay cash for them and did not make much profit on the three. Let me hear from you.

"With kind regards to Mrs. Jacobs, I am

"Sincerely yours,

"ARTHUR L. WARTHEN."

"Perkins did not buy a horse from any one."

In this letter, as will be readily noted, plaintiff sets forth his idea of the contract and reminds defendant that he would not have sold the horse, Semper Ego, to any one else on the same terms. Defendant in his reply to this letter on June 7, 1911, instead of denying a sale of the horses to him, enclosed to plaintiff his note for $450 for the Pendennis mare and the Black Cock horse, saying among other things: "These two horses, as you know, I would not have bought except to get the Semper Ego. They came here in the shape I saw them and I accept them. The Semper Ego came wabbling and stumbling." Notwithstanding, defendant also stated in the letter just mentioned that he was told of Semper Ego's injuries the next morning after he got him, he never mentioned the subject to the plaintiff for three weeks thereafter, and then by letter of April 21, 1911, copied above, said: "My boy was all day getting him here, as he staggered and had to be led down some of the hills. He is better than he was, but when I brought him out yesterday to show to Twigg, I had to have a man on each side of the door to keep him from hitting his hips. Neither Twigg nor the Captain noticed it, so I had him put back as quick as I could, and told them that he

was yet too green for what Twigg wanted." To the letter of the defendant of date June 7, 1911, *supra,* plaintiff replied on June 9, 1911, declining to accept the note enclosed to him by defendant, and returned the same to him, and again insisted that he sold the three horses to the defendant for $1,050; that he could prove by others who saw the horses the afternoon before they started to defendant's home that the horse, Semper Ego, "was sound, nimble and nothing the matter;" that he could prove by defendant's neighbors that the horse was not crippled after he had gone two miles of the journey to defendant's home; and that defendant never mentioned to plaintiff or to his (defendant's) neighbors, or to any of plaintiff's friends, for ten days after the horse was received at defendant's home any trouble with the horse. "The certificate you sent me shows that the horse was probably hurt trying to jump him, and he never once saw a jump in my hands since you had him out at the show grounds. I, of course, would hate for you to lose money on the horses, but I neither guaranteed their life, nor did I guarantee that you would make money . . . Had I said to you, as I would to most men, the night before, 'Send me your note for $1,050.00 and you can have the horses,' you know you would have done it. Now because I trusted you I ought not to have to beg for it."

Defendant later agreed to give his note, endorsed by his wife, for the purchase price of the three horses, but on the following day he forwarded to plaintiff a note for $650 instead of the amount agreed upon, which note was returned, and on April 12, 1912, this action was instituted.

We deem it unnecessary to review the evidence further than we have done in stating the case, for it is sufficient to say that if the trial court did not err in admitting certain evidence objected to, or in giving or refusing instructions, the evidence, viewed as upon a demurrer thereto, is not only amply sufficient to sustain the verdict of the

jury, but no other finding could have been properly made thereon.

Did the court err in permitting certain evidence to go to the jury? This question arises on defendant's bills of exceptions Nos. 1, 2 and 3, the first being to the court's ruling in permitting Captain Conrad, a witness offered in rebuttal by the plaintiff, "to be asked and to answer the question: 'Will you tell the jury whether or not that horse (referring to Semper Ego) was sound?' " Not only does the court certify in this bill of exceptions that both sides were given the fullest opportunity to develop their case, but the exception fails to set out what answer, if any, was given to the question, or was expected when the question was propounded; nor does it in any way bring to the attention of this court the evidence that preceded it, but leaves the court to an examination of the whole of the preceding evidence in order to know whether or not the question and the answer, or expected answer, thereto were proper.

The same is true of bill of exceptions No. 2.

Bill of exceptions No. 3 does not set out the questions asked the witness, over the objection of the defendant, and the answers made by the witness thereto, but as in exceptions Nos. 1 and 2, no reference is made to the evidence that preceded this evidence objected to, thus leaving this court to an examination of the whole of the preceding evidence in order to know whether the questions and answers were proper or not.

"A bill of exception to the ruling of the court on the admissibility of evidence is not sufficient, although it gives the question asked the witness and his answer thereto, unless it also contains sufficient of the evidence which has preceded to give this court a clear apprehension of the propriety or impropriety of the ruling of the trial court."

*Holleran* v. *Meisel,* 91 Va. 143, 21 S. E. 658, and *Burton* v. *Siefert & Co.,* 108 Va. 338, 61 S. E. 933.

The principal object, however, in the three bills of exceptions just adverted to, was to save the point for review by this court, that the lower court erred in admitting in *rebuttal* the testimony of the *witnesses named* in the exceptions.

In *Burke* v. *Shaver,* 92 Va. 345, 23 S. E. 749, it was held: "The examination of witnesses lies chiefly in the discretion of the trial court, and its exercise is rarely, if ever, to be controlled by an appellate court. Much latitude of discretion should be allowed the trial court in the matter of recalling witnesses, and its action will not be reversed by an appellate court except for palpable error."

In *N. & W. Ry. Co.* v. *Morris,* 101 Va. 422, 44 S. E. 719, this rule was sanctioned and approved, the opinion saying: "It (this court) will not reverse merely because evidence proper in chief was introduced in rebuttal." See also *Pocahontas C. Co.* v. *Williams,* 105 Va. 708, 54 S. E. 868; *Bettman* v. *Skinner,* 113 Va. 24, 73 S. E. 436.

Even if bills of exceptions Nos. 1, 2 and 3 in the present case were properly to be considered, we find nothing in the record that would warrant us in regarding it as coming within an exception to the established rule to which we have just adverted.

The learned judge of the trial court gave to the jury seven instructions asked for by the plaintiff, two (8 and 9) of its own volition, and also instruction No. 1, asked by the defendant, rejecting defendant's instruction No. 2, to which ruling defendant excepted. The instructions given (and set out in the official report of this opinion) fairly and fully submitted to the jury the case on every material point involved, stating, as we view the instructions and the record, the defendant's rights and duties liberally, as well as justly and fairly. But even if the instructions

were not correct, it is unnecessary to consider the rulings of the trial court thereon, since no other verdict than that rendered by the jury could, in our opinion, have been properly found. *Schwalm* v. *Beardsley,* 106 Va. 407, 56 S. E. 135; *Ches. & Ohio Ry. Co.* v. *Fortune,* 107 Va. 412, 59 S. E. 1095; *Vaughan* v. *Pleasonton,* 112 Va. 508, 71 S. E. 529; *W. V. Ry. Co.* v. *Bouknight,* 113 Va. 696, 75 S. E. 1032.

The rulings of the trial court complained of are without error and its judgment upon the verdict of the jury is, therefore, affirmed.

*Affirmed.*