**SANITARY LINEN SERVICE CO., a Florida corporation, Plaintiff,**

**v.**

**ALEXANDER PROUDFOOT COMPANY, an Illinois corporation, Defendant.**

**No. 66–179–Civ–CA.**

United States District Court
S. D. Florida,
Miami Division.
May 12, 1969.

Daniel Neal Heller, Miami, Fla., for plaintiff.

Hugo L. Black, of Kelly, Black, Black & Kenney, Miami, Fla., for defendant.

## MEMORANDUM OPINION

ATKINS, District Judge.

The plaintiff, Sanitary Linen Service Co., (hereinafter Sanitary) seeks damages in excess of $1,000,000 for breach of contract and express warranty by the defendant, Alexander Proudfoot Company (hereinafter Proudfoot). Proudfoot denies any warranty and asserts Sanitary failed to cooperate and waived any breach by paying Proudfoot after knowledge of the claimed breach. The case was tried without a jury and the Court makes findings of fact and conclusions as set forth in this memorandum.

Jurisdiction is based on diversity. The Plaintiff is a Florida corporation with its principal place of business in this state. The defendant is an Illinois corporation and has its principal place of business in that state also.

Sanitary rents and processes linen to industry and operates a commercial laundry. Besides the Miami plant, Sanitary also operates subsidiary plants in Orlando and Pensacola which were likewise the subject of the contract between the parties.

Proudfoot sells and installs a scheduling system designed to determine work predictability and thereby recover lost time with consequent savings in payroll.

### THE AGREEMENT BETWEEN THE PARTIES

After a "no-obligation" survey and analysis [1] of the operations, Proudfoot made a written offer to install a scheduling program at Sanitary's three plants. This proposal, dated March 12, 1964 is Sanitary's Exhibit 4. After a three to four hour discussion between

---

1. Proudfoot presented a list, styled "what we find", of 17 separate deficiencies in Sanitary's operations. (Sanitary's Exhibit 16) William Lamdin, one of the members of the analysis team, testified that he saw a document on March 2 in Miami, the day before he began work on the analysis, which has the same "points" on it except for the reference to "routemen." Lamdin said that he was told by Carlton West, Chief of the analysis team, to copy this document "by hand so that I'd know what they were looking for during the analysis."

the parties, Sanitary accepted the proposal. The reciprocal obligations of Sanitary and Proudfoot were as follows:

1. Proudfoot agreed to introduce into Sanitary's operations a "worthwhile installation of schedule and method improvements designed to provide greater control over utilization of man and machine hours and to effect operating economies."

2. Sanitary agreed to give its "full cooperation during the course of the program" to assure maximum results.

3. Sanitary also was required to use the full influence of its authority with its personnel "for the successful consummation" of the program.

Proudfoot's undertaking is also reflected in part by the following excerpt from its proposal of March 12, 1964:

> "Payroll savings during the first year following completion of our installation are estimated to be $246,600.00.[2] Please note that we are not attempting to evaluate in dollars such benefits as improved management controls, volume forecasting, better customer service and other advantages that will accrue.

> "In the application of our program, we will require the services of one or more members of our staff for a period of ninety-four (94) man weeks at Eight Hundred ($800.00) Dollars per man week net, payable weekly as invoiced.

> "Should you elect to proceed with this program in phases, a breakdown of savings and man weeks will be as follows:

|  | Savings | Man-Weeks |
|---|---|---|
| Phase A | | |
| Miami | $149,400.00 | 63 |
| Phase B | | |
| Orlando and | | |
| Pensacola | 97,200.00 | 40." |

Sanitary also contends Proudfoot estimated that at about midway through the program—when 50% of the program had been completed—the effected savings would be more than the cash outlay.

It is undisputed that Sanitary paid Proudfoot a total of $74,200 billed over a period of some six months.

Proudfoot sent its operations staff to Florida immediately after the agreement was consummated. Nelson Sidell was installation manager. William Lamdin and John Bagens served as staff members. Chief of the operation was Norman Cabral. When about half of the projected ninety-four weeks had expired, B. B. Goldstein, President of Sanitary, became concerned because he believed no benefits had been received. Proudfoot's own schedule provided that thirty-two employees were to have been eliminated by May 22. (Sanitary's Exhibit 11, page 8). Sidell assured him savings were there to be obtained but "just farther away" and that very shortly they would recommend that twenty-six employees in the production department be released. This was done at the Miami plant the week ending June 5 after a conference with the plant superintendent who selected those to be discharged.

When the layoff was made at Miami Sidell admits that Proudfoot wasn't ready with a "schedule plan." "Reasonable expectancy" (a given worker in a given job), the other element Sidell testified was necessary for success of a Proudfoot installation, was prepared. Forms were also developed for Sanitary's use. But without a schedule plan the program could not be made viable. Lamdin testified Proudfoot was never able to develop an over-all schedule plan that would develop a continuous flow and eliminate lost time. Bagens' testimony is to the same effect. A week after the layoff it was necessary to operate the plant longer hours to get the

2. While this figure would appear to be based on some exact computation resulting from the survey, the very day the analysis started on March 2, Proudfoot had this sum fixed as its goal. (Sanitary's Exhibit 18, page 2)

work out. Employee complaints followed. To remedy the problem, 26 workers had to be re-hired, with Proudfoot's approval, beginning four to six weeks after their discharge.

A similar experience occurred in Orlando. Proudfoot recommended that six positions be eliminated at Orlando in the production department. After they were released, three were restored with Proudfoot's approval. The total to be discharged at the Orlando plant was twenty-four.

Two of Proudfoot's staff (Lamdin and Bagens) assigned to the Sanitary program had had no prior experience in scheduling. This was their first employment by Proudfoot. Nelson Sidell, the installation manager on the Sanitary job, was discharged by Proudfoot in July.

No other "installations" were attempted.

### SANITARY GAVE FULL COOPERATION

Proudfoot urges that Sanitary's failure to cooperate was the proximate cause of any failure to install a feasible plan. The evidence preponderates to the contrary.

As early as March 13, 1964, Sanitary scheduled a meeting of key personnel at the Miami plant to introduce the Proudfoot team and to inform its personnel of their purpose and to recommend that the Sanitary "people assist openly and willingly." Mr. S. Kruse, the Executive Vice President of Sanitary, telephoned each of the other plant managers and explained "our project, our presence, and our purpose." Introductions were made at the Orlando and Pensacola locations. Memoranda were placed on the bulletin boards in both English and Spanish so that everyone in the organizations would be aware of the program. (Sanitary's Exhibit 7)

Sanitary hired coordinators and scheduling clerks at Proudfoot's request at a cost of $15,000.00.

Two Miami plant managers were fired and replacements hired at the sugges-

tion of Proudfoot. Numerous meetings with the supervisors were held to accomplish cooperation and to iron out any difficulties.

There were some problems with lower echelon employees. Supervisors were slow in turning in "action needed" reports. But when fluctuations in cooperation occurred Proudfoot went to the next level of command and "got firm, positive action," as described by Sidell.

Proudfoot maintained a weekly "client contact Record and Fever Charts" which reflected the attitude of key personnel. (Proudfoot's Exhibit 12) These varied somewhat but in the main they reflected the symbol "G" for "Good".

Proudfoot contends that Sanitary cannot recover because it continued to pay the amounts billed when it knew no savings were being effected. This would have the anomalous effect of denying relief to one who had performed his contract in good faith reliance upon the other party's promise to perform. Proudfoot simply had not produced the expected savings. This in no way can be said to be a breach. Without a breach by Proudfoot, Sanitary was obligated to continue its payments. As noted above Mr. Sidell assured Mr. Goldstein that savings were forthcoming, thus relieving the latter's concern over Proudfoot's failure to produce any savings. Sanitary had no indication that Proudfoot would breach the contract since at all times Proudfoot's employees remained on the job.

### DAMAGES RECOVERABLE

The one remaining question is the measure of damages to which Sanitary is entitled. Sanitary contends it is entitled to $246,600 for each of the years subsequent to September, 1964 because this amount was guaranteed or warranted. By implication, Sanitary urges that at the expiration of each year hereafter it would be entitled to file an action for and recover $246,600. At best such savings were only an estimate if a workable schedule plan had been con-

ceived. Other benefits were also suggested in the proposal letter.

Even had such a plan been developed, the elements incident to such savings involved so many variable, unpredictable factors that it would be conjectural to determine them in advance. Nevertheless, Sanitary was at least entitled to have a workable program presented to it for installation. Sanitary has in no way alleged or proved that it has been damaged by entering into this contract with Proudfoot. Sanitary is in no worse position now than it was when Proudfoot first contacted Sanitary except for the sum paid Proudfoot. In fact, the evidence indicates that Sanitary has received some slight benefits from Proudfoot's activities, although none of them can be evaluated by monetary savings. Therefore not having received what it bargained for, Sanitary should be made whole and thus receive the sum paid to Proudfoot, viz., $74,200.

In essence what Proudfoot agreed to furnish was services. There can be no warranty for proposed services unless such was clearly stated and assumed by the warrantor. I find no such statement and assumption on the part of Proudfoot. Snow's Laundry & Dry Cleaning Co., Inc. v. Georgia Power Co., 61 Ga.App. 402, 6 S.E.2d 159 (C.A. Ga., 1939) and Howard v. United Fuel Gas Co., 248 F.Supp. 527 (S.D.W.Va., 1965). Warranties deal with facts. Although obviously the suggested savings were intended as an inducement, potential savings are not facts to which a warranty may attach but are merely estimates with uncertain reliability. Metropolitan Coal Co. v. Howard, 155 F.2d 780 (2d Cir. 1946). Likewise, where services are involved, there is no implied warranty of fitness or merchantability. White v. Sarasota County Public Hospital Board, 206 So.2d 19 (2 D., Fla.App.1968).

The Court makes the following findings of fact in supplement to those above:

A. Proudfoot did not "guarantee" or "warrant" to Sanitary that payroll savings of $246,600 would accrue "during the first year following the completion of our installation."

B. The figure of $246,600 was an estimate only.

C. The agreement between the parties contained no provision that by the time one-half of the total fee of $74,200 had been paid by Sanitary, one-half of the estimated savings would be realized.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties.

2. The plaintiff is entitled to recover from the defendant the sum paid, viz., $74,200 plus interest from September 15, 1964 at the statutory rate.

3. Costs will hereafter be awarded as the Court will determine after notice and application.

4. The plaintiff will submit a proposed form of judgment within ten days from date.