**WHITEHORSE MARINE, INC., Plaintiff,**

v.

**GREAT LAKES DREDGE & DOCK COMPANY, Defendant.**

**Civ. A. No. 89–132–N.**

United States District Court, E.D. Virginia, Norfolk Division.

March 5, 1990.

Charles F. Tucker, Jane D. Tucker, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

John R. Crumpler, Jr., Patrick H. O'Donnell, Kaufman & Canoles, Norfolk, Va., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALTER E. HOFFMAN, Senior District Judge.

Plaintiff, Whitehorse Marine, Inc. ("Whitehorse"), filed this action seeking to recover monies spent in defending and settling a personal injury action brought against it by one of its employees, Guy Leon Webb. Mr. Webb was injured while working as a deckhand aboard the Whitehorse tug, "PEGASUS II," when the tug touched bottom in the southern access channel leading to the Craney Island disposal area. At the time of Webb's injury, the PEGASUS II was towing a loaded Great Lakes Dredge & Dock Company ("Great Lakes") barge to the disposal area for dumping. Contending that Great Lakes warranted the depth of the access channel as sufficient for use of the PEGASUS II and/or that Great Lakes negligently misrepresented the depth of the access channel, plaintiff sought contribution and/or indemnity from Great Lakes for

amounts paid to Webb and for legal expenses incurred in defending Webb's lawsuit.

## FINDINGS OF FACT

1. The Army Corps of Engineers ("Army Corps") contracted with the Southern Dredging Company ("Southern") to dredge the Craney Island disposal area and the southern access channel leading to the disposal area. Southern, with the permission of the Army Corps, subcontracted with Great Lakes to dredge a portion of the Craney Island disposal area and the southern access channel to a depth of 18 feet as required by the Army Corps contract with Southern. On or before June 10, 1987, Great Lakes completed the dredging work called for in its contract with Southern.

2. On or before June 10, 1987, Great Lakes completed soundings of the areas it had dredged which show the depth of the access channel ranged between 17 feet 3 inches and 19 feet 5 inches in depth.

3. On or about June 15, 1987, the Army Corps completed soundings of the areas dredged by Great Lakes and accepted the dredging work as complying with the contract which required a dredged depth of 18 feet. The evidence showed that some slight variation in depth was tolerated as acceptable because of the imprecise nature of the work and of measurement techniques.

4. In July of 1987, following discussions in Norfolk, Virginia, between Matthew H. Lipkin, part owner and operations manager of Whitehorse; Harold Costner, a Whitehorse tugboat captain; and Russell L. Casey, Great Lakes's project manager, Whitehorse and Great Lakes entered into an oral contract whereby Whitehorse, for an hourly towing fee, would tow Great Lakes's barges loaded with fill material from a dredge site on the eastern branch of the Elizabeth River to the Craney Island disposal area, where the material would be dumped and the barges then returned to the Great Lakes dredge site.

5. In order to reach the disposal area, the tug and tow had to navigate through the southern access channel, which led from the main channel to the disposal area.

6. During the discussions which led up to the oral towing contract, Costner expressed his concern that the access channel was too shallow to accommodate the 16-foot draft of the tug, PEGASUS II, the only Whitehorse tug with sufficient horsepower to do the job.[1] In response, Casey informed Lipkin and Costner that Great Lakes previously had dredged the access channel and part of the disposal area to a depth of 18 feet. Casey produced a chart of the area indicating the areas dredged by Great Lakes.

7. Under the command of either Harold Costner or Gerald Tillett, the tug, PEGASUS II, made dumping runs on July 26, July 27, two runs on July 28, and the July 29, 1987 run in which Webb was injured. The evidence presented at trial demonstrates that as a result of these previous dumping runs, both Costner and Tillett became aware, before Tillett made the July 29, 1987 run, that the southern Craney Island access channel was less than 18 feet deep in places. The evidence showed that Tillett, in fact, had touched bottom on earlier trips through the same area with the same tug.

8. On July 29, 1987, at approximately 4:00 a.m., the PEGASUS II, under the command of Captain Tillett, was towing a Great Lakes barge loaded with fill materials to the Craney Island disposal area for dumping when the tug touched bottom. After the tug entered the southern access channel, the tug touched bottom causing it to slow or stop while the barge (with a shallower draft) continued to move forward causing a nonstandard cleat or pin on the starboard chock to give way thereby releasing or parting a previously taut tow line. Deckhand Webb was struck and injured by either the cleat or the tow line.

9. The failure of the nonstandard cleat or pin on the starboard chock of the PEGASUS II constituted an unseaworthy condition. The evidence showed that, because of

---

1. The 16-foot draft of the PEGASUS II exceeded   the draft of the fully-loaded Great Lakes barges.

**108**

the tug's slow speed, the strain on the pin from the grounding was not greater than the strain exerted in making routine turns.

10. The PEGASUS II did not have an operational depth-finder at the time of the accident, leaving the captain to judge any depth variation in the channel only by feel or by past experience.

11. Webb brought suit against Whitehorse alleging that his injuries were caused by an unseaworthy condition of the PEGASUS II and/or by the Jones Act negligence of Whitehorse. A settlement was reached whereby Whitehorse paid $366,-258.00 to Webb. Whitehorse also incurred the sum of $48,591.32 in maintenance and cure payments made on behalf of Webb and further incurred $7,192.44 in legal fees and expenses in defending against Webb's lawsuit. Great Lakes stipulated that the amounts paid in settlement to Webb, the amount of maintenance and cure, and the legal fees and expenses incurred by Whitehorse in defending against Webb's lawsuit were reasonable under the circumstances.

### CONCLUSIONS OF LAW

*Count I—Breach of Express Warranty*

Whitehorse contends that Casey, on behalf of Great Lakes, expressly warranted the depth of the Craney Island southern access channel and that this warranty was breached when the PEGASUS II touched bottom on July 29, 1987.

1. The construction of a maritime contract, such as the towage contract at issue here, is normally governed by federal rather than state law. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981); *M.O.N.T. Boat Rental Ser., Inc. v. Union Oil Co. of California*, 613 F.2d 576, 579 n. 6 (5th Cir.1980); *Navieros Oceanikos, S.A., Liberian Vessel Trade Daring v. S.T. Mobil Trader*, 554 F.2d 43, 47 (2d Cir.1977). *But cf. Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) (where no clear federal precedent exists, court may look to state law to interpret contract of marine insurance). Because no difference exists between the relevant federal and state law regarding the creation of an express warranty, however, this court need not decide which law governs.

■ 2. An express warranty is a factual affirmation or promise, the natural tendency of which is to induce the affirmee or promisee to enter into a contract in reliance on the affirmation or promise. While actual reliance *per se* is not a requisite of warranty, the characteristic of inducement is an indispensable ingredient of an express warranty. *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 303 (4th Cir.1962); *W.N. Clark Co. v. Miller Mfg. Co.*, 224 F.2d 660, 663 (4th Cir.1955); *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir.1946) (applying admiralty law); *Banko v. Continental Motors Corp.*, 251 F.Supp. 229, 233 (E.D.Va.1966) (applying Virginia law); *McNeir v. Greer–Hale Chinchilla Ranch*, 194 Va. 623, 74 S.E.2d 165 (1953); *Reese v. Bates*, 94 Va. 321, 26 S.E. 865 (1897). Express warranties are not presumed and will not be inferred from ambiguous, inconclusive, or general discussions. The language employed must indicate a clear intention to enter into a contract of warranty when it is viewed in light of all the facts and circumstances surrounding the transaction. *Jacobs v. Warthen*, 115 Va. 571, 576, 584, 80 S.E. 113 (1913); *Reese v. Bates*, 94 Va. at 330, 26 S.E. 865. *See also, Paccon, Inc. v. United States*, 399 F.2d 162, 168, 185 Ct.Cl. 24 (1968); *Sanitary Linen Serv. Co. v. Alexander Proudfoot Co.*, 304 F.Supp. 339, 343 (S.D.Fla.1969).

■ 3. Casey represented only that Great Lakes had recently dredged the access channel to a depth of 18 feet. This representation was not a warranty that the channel was 18 feet deep at the time of the representation, nor was it a warranty that the channel would remain 18 feet deep for the duration of the Whitehorse towing contract. The representation related to a previously existing condition and was accurate. The result of soundings taken by Great Lakes and the Army Corps shows, with minor exception, that the southern access channel was dredged by Great Lakes to a depth of 18 feet at least one month before Casey's meeting with Lipkin

and Costner. The Army Corps accepted the Great Lakes dredging of the southern access channel as in compliance with its 18–foot depth requirement. Therefore, if a warranty was made, it related only to the depth of the access channel at some time prior to the meeting between Lipkin, Costner and Casey. It cannot form the basis for imposing liability on Great Lakes for the results of a subsequent grounding, particularly since it appears from the evidence that the warranty, if made, was not breached. *See Simone v. Genmar Indus., Inc.,* 1989 AMC 2627, 2629 (S.D.N.Y.1989) (yacht manufacturer's statements as to the quality of its product did not rise to the level of an express warranty of future performance).

### Count II

Plaintiff next argues it is entitled to indemnity and/or contribution from Great Lakes on the ground that Great Lakes negligently misrepresented the depth of the southern access channel.

4. In order to sustain a claim for the tort of negligent misrepresentation under maritime law, plaintiff must prove that: (a) Great Lakes, in the course of its business, supplied false information for the plaintiff's guidance in a business transaction; (b) Great Lakes failed to exercise reasonable care in gathering or communicating the information; (c) Whitehorse justifiably relied on the false information in a transaction that Great Lakes knew would be influenced by the information; and (d) Whitehorse thereby suffered pecuniary loss. *See Royal Embassy v. Ioannis Martinos,* 1986 AMC 769 (E.D.Va.1986). *See also Coastal (Bermuda) Ltd. v. E.E. Saybolt & Co.,* 826 F.2d 424, 428 n. 7 (5th Cir.1987); *Somarelf v. American Bureau of Shipping,* 704 F.Supp. 59, 64 (D.N.J.1988).

5. As noted above, the evidence presented at trial demonstrates that Great Lakes did not provide Whitehorse with false information. Lipkin and Costner testified only that Casey showed them a chart of the Craney Island disposal area and access channel which indicated by red diagonal lines the areas which had been dredged by Great Lakes one month earlier. While the chart itself does not indicate the depth to which the areas were dredged, Lipkin and Costner testified that Casey told them the southern access channel had been dredged to a depth of 18 feet. Soundings taken in the access channel by Great Lakes on or before June 10, 1987 and by the Army Corps on or about June 15, 1987, indicated that the channel varied in depth from 17 to 20 feet. The Army Corps, for whom the dredging was done, accepted Great Lakes's performance of the dredge work as complying with the contract requirement, which called for a depth of 18 feet in the access channel.

6. Mr. John T. O'Brien, a division engineer at Great Lakes, testified without contradiction that even though depths of less than 18 feet were recorded in the access channel after Great Lakes completed dredging operations, the Army Corps certified Great Lakes's compliance with the 18–foot contract requirement because the shallower areas were insignificant and presented no hazard to navigation and because the Army Corps recognized the difficulty of maintaining a specified depth for any period of time given the heavy, and sometimes unauthorized, dumping traffic flowing through the channel.

7. Because this Court finds that no false information was supplied to Whitehorse by Great Lakes, plaintiff's claim based on negligent misrepresentation must fail.

8. It should be noted that even if Casey's representation that the access channel previously had been dredged to a depth of 18 feet was false, Whitehorse could not justifiably rely on that representation to conclude that the channel would remain 18 feet deep. As a result of dumping runs made prior to the July 29, 1987 run in which Webb was injured, Costner and Tillett were aware that some portions of the channel were less than 18 feet deep.

### CONCLUSION

In accordance with the above Findings of Fact and Conclusions of Law, final judg-

**110**

ment is being entered in favor of defendant Great Lakes.